738 So.2d 57 (1999)
STATE of Louisiana
v.
Maurio ALEXIS.
No. 98-KA-1145.
Court of Appeal of Louisiana, Fifth Circuit.
June 1, 1999.
*60 Katherine M. Franks, Louisiana Appellate Project, Baton Rouge, Louisiana, Attorney for Appellant, Maurio Alexis.
Rodney A. Brignac, Assistant District Attorney, Parish of St. John The Baptist, LaPlace, Louisiana, Attorney for Appellee, State of Louisiana.
Panel composed of Judges EDWARD A. DUFRESNE, Jr. JAMES L. CANNELLA and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
Defendant, Maurio Alexis, appeals from his conviction for second degree murder and his life sentence without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm and remand.
On the night of January 26, 1991, the body of Mullin Dinvaut was discovered by Leo Williams, who was on his way to Garyville from Laplace on Louisiana Highway 54. Mr. Williams had seen a police officer near the intersection and went for help. Lieutenant Kenneth Mitchell of the St. John the Baptist Parish Sheriffs Office was working an off-duty detail at Marathon Oil Company in Garyville. Lieutenant Mitchell testified that at 11:35 p.m., Mr. Williams told him that he had seen the body of a black man lying in the road. Lieutenant Mitchell followed Mr. Williams to the body, and discovered that the victim was alive but was unresponsive. Lieutenant Mitchell noticed that the victim's pants were unzipped. Lieutenant Mitchell called for an ambulance and emergency personnel.
Sergeant Clarence Gray was dispatched to the location, and he and Lieutenant Mitchell secured the scene while awaiting other officers. Todd Clement of the Garyville Volunteer Fire Department arrived shortly after Sergeant Gray. He testified that he checked the victim's vital signs and discovered that the victim was breathing, but was unresponsive, and was bleeding profusely from a wound to his head. The victim was then transported to the hospital where he died shortly thereafter. Dr. Dominic Arcuri, III, the assistant coroner of St. John the Baptist Parish, was on call that night. Dr. Arcuri testified that he was notified of the victim's death by the emergency room physician, and that the victim was pronounced dead at 12:40 a.m.
Dr. James Elston, an expert pathologist, performed the autopsy on the victim. He testified that the cause of death was a gunshot wound to the head. The medium caliber bullet entered behind and slightly below the victim's left ear and lodged in the victim's skull above his nose. According to the autopsy report, there was "sooting" around the wound. Dr. Elston testified that, based on this report, the distance between the victim and shooter was only a couple of inches. Dr. Elston testified that tests were performed that detected the presence of alcohol above the legal limit as well as Benadryl in the victim's system. The autopsy report also revealed that the victim had a "fresh contusion" above his left eyebrow. Sergeant Harry Troxlair attended the autopsy and testified that the projectile removed from the victim was consistent with a .38 caliber bullet.
Several other officers of the St. John's Sheriffs Office responded to the incident that night. Deputy Eldridge Moll drove around the area, and at approximately 2:00 a.m., he saw a silver Chrysler LeBaron in Mt. Airy on Post Office Lane near the railroad tracks. A computer check of the vehicle's license plate number revealed that the car was registered to the victim. Deputy Moll then stayed with the car until his supervisor, Captain Oubre, and other officers arrived. When he arrived, Captain Oubre assisted in securing the vehicle until it could be processed by the crime *61 scene technicians. Captain Robert Hay also responded to the call that night and arrived at the hospital shortly after the victim died. Captain Hay testified that he observed that the victim had a small contusion, or laceration above his left eyebrow, and that the victim was wearing a 14-carat gold and onyx ring and a gold necklace. He investigated the location where the body was discovered, and then went to Post Office Lane. Captain Hay testified that the victim's vehicle was located .8 of a mile southwest of the place where the victim was found. Captain Hay further testified that he observed that the key was in the ignition, the vehicle was in drive, and the windshield wipers were on. He noticed blood on the driver's side interior of the car and on the back seat.
The first suspect in the murder was Karl Jackson. Captain Hay testified that, on the night of the murder, Karl Jackson was seen with the victim at Mertle Ann's Lounge, also known as Nicholson's Lounge, in Reserve. According to witnesses, the victim and Karl Jackson walked out of the lounge together and left in the victim's car. Patrick Walker saw the victim talking to Karl Jackson at Nicholson's Lounge that night. Walker testified that he saw the victim and Jackson walk out of the lounge together around 11:00 p.m., but did not see them enter the car together. Walker further testified that he also saw the defendant standing outside of the lounge that night after 9:00 p.m.
Early on the morning after the homicide, Captain Hay interviewed Karl Jackson at the Detective Bureau. Captain Hay testified that he advised Jackson of his Miranda rights and informed Jackson he was a suspect in the murder investigation. Captain Hay testified that Jackson said he had been driving the victim's car between 10:00 p.m. and 11:00 p.m. Captain Hay testified that Jackson told him that he and the victim had sexual relations that night, but denied that he was involved in the homicide. Jackson submitted to a gun shot residue analysis test and also submitted his clothing for tests. Patrick Lane, an expert in firearm identification and fingerprint analysis, testified that the results from the tests were negative. Mr. Lane testified, however, that he would not expect to find gun powder residue on someone five to six hours after the person had fired a gun; and no conclusion could be drawn as to whether or not Jackson had fired a gun that night.
At trial, Karl Jackson testified that he saw the victim at the lounge that night, but that he left the lounge before the victim. Jackson testified that he told Captain Hay that he was hitchhiking home from the lounge, and the victim gave him a ride. Jackson said that the victim was alone when he left Jackson's house, but that he saw someone standing at the end of the road. In his trial testimony, Jackson denied that he had sexual relations with the victim. Finally, Jackson stated that he was never arrested for the homicide, but that he was held in jail for unrelated charges.
Captain Hay testified that the investigation focused on the defendant as a suspect later that year after obtaining statements from various individuals. One of these individuals, Cleveland Carter, gave a statement on October 22, 1991 to Captain Hay while incarcerated. Carter testified that he told Captain Hay that, around midnight on the night of the homicide, he saw the defendant, Ernest Washington ("Snow"), Hollis Braxton, and Rico Lee riding in the victim's car in the Reserve Housing Project. He noticed the car because of the loud music coming from the car, and also saw the car's inside dome light was illuminated. The car stopped at the corner and the occupants talked to Allen Holland for a few minutes. Carter testified on direct examination that Washington was driving, the defendant was in the front passenger's seat, Braxton was in the backseat behind the driver and Lee was on the passenger side in the back seat.
*62 Carter testified that he had been in and out of jail since he was seventeen and that he had been released from jail the day before he was testifying because his sentence was over. On cross-examination, Carter was shown his prior statement in which he said that the defendant was the driver and Washington was the front seat passenger. After being shown the statement, Carter testified he could not remember whether Washington or the defendant was driving, but stated that it was one or the other.
A day after Carter's statement, Allen Holland gave a statement to Captain Hay. Holland testified that he told Captain Hay that between 12:30 a.m. and 1:00 a.m. on the night of the homicide, he saw the defendant driving the victim's car. Holland said that Washington was in the front passenger's seat and that Braxton and Lee were in the back seat. Holland testified that he walked up to the car, and Lee told him they were looking for Clarence Bolden ("Country"). Holland testified that he was leaning up against the driver's side and saw a gun that looked like a .38 caliber revolver on the car's console. He said that the driver's door was not open and that he did not see any blood in the car. Holland admitted that he had prior convictions.
Based on the information received from Holland and Carter, Captain Hay questioned Hollis Braxton on October 23, 1991. A few months later, on January 24, 1992, Captain Hay interviewed Rico Lee.[1] In their statements to Captain Hay, both Lee and Braxton stated that the defendant had shot Mullin Dinvaut that night after attempting to rob the victim.
Defendant was arrested for killing Mullin Dinvaut. The Grand Jury for the Parish of St. John the Baptist returned a bill of indictment on August 16, 1994, charging defendant Maurio Alexis and a codefendant, Ernest Washington, with first degree murder. The defendant pled not guilty at his arraignment on September 21, 1994. The state amended the indictment on February 8, 1995, to charge defendant and Washington with second degree murder. Defendant was re-arraigned and he pled not guilty. On September 20, 1995, trial commenced before a jury of twelve persons. Lee and Braxton testified at this trial in accord with the statements they had previously given Captain Hay. On September 22, 1995, the trial ended in a mistrial when the jury was unable to reach a verdict. The state later dismissed the indictment against Ernest Washington. One year later, on September 18, 1996, trial commenced against the defendant for the second time.
At this trial, Lee and Braxton again testified. However, both of them recanted their statements to Captain Hay, as well as their prior sworn testimony from the first trial. While Braxton and Lee admitted that they had made the prior statements, they testified that the statements were coached and were elicited under threats by Captain Hay. Both Lee and Braxton testified that they were at a party with Cleveland Carter at Allen Noble's residence in Laplace on the night of the murder. They denied seeing either the victim or the defendant that night. Recordings of these statements, as well as transcripts of Lee and Braxton's testimony at the prior trial, were admitted into evidence.[2]
Captain Hay testified that fingerprints were lifted from the car, but that none of the latent prints were matched to any individual, including the defendant. According to Captain Hay, Jackson was excluded as a suspect after taking the statements of Carter, Holland, Braxton and Lee.
*63 The defendant sought to establish an alibi defense through the testimony of Burna Washington, Gregory Morris, and Tremaine Joseph, who said that they saw the defendant at the Streamline Bar in Lutcher on the night of the murder. The defense also attempted to show that Lee, Braxton, and Washington were elsewhere that night. Corey Edwards and Albert Noble testified that Lee, Braxton, and Cleveland Carter were at a party in Laplace on the night of the murder and that Lee and Braxton spent the night at his residence. Danielle Coleman testified that Ernest Washington and his fiancee, Tammy Coleman, stayed overnight at her godmother's house in Reserve on the night of the homicide.
On September 20, 1996, the jury returned a unanimous verdict of guilty as charged. The defendant filed motions for post verdict judgment of acquittal and new trial, which were denied on October 10, 1996. After the defendant waived delays, the trial judge sentenced the defendant to serve life imprisonment without benefit of parole, probation or suspension of sentence for twenty years, which was an illegally lenient sentence. On its own motion on December 4, 1996, the trial judge corrected defendant's illegally lenient sentence and re-sentenced the defendant to serve life imprisonment without benefit of parole, probation or suspension of sentence. On March 24, 1997, the defendant filed a motion for appeal, which the trial judge denied as untimely. On May 28, 1998, the trial judge granted the defendant's post conviction relief application seeking an out-of-time appeal. On September 22, 1998, the defendant filed a motion for appeal, which the trial judge granted the same day.
On appeal, defendant assigns thirteen errors.

ASSIGNMENTS OF ERROR NUMBERS 1-4
Assignments of error numbers 1 4 are considered together herein because of their interrelationship. By these assignments of error defendant argues that the trial judge erred in admitting into evidence the video and audio tapes of the earlier statements given by witnesses Hollis Braxton and Rico Lee and in admitting the transcript of their testimony from the previous trial that resulted in a hung jury. Defendant also argues that the trial judge erred in allowing the prosecutor to call these witnesses merely to impeach them by introducing the above inadmissible evidence. Finally, it is defendant's position that the tapes and transcripts cannot be used as substantive evidence of his guilt and absent that evidence the legally admitted evidence presented at trial was insufficient to support his conviction for second degree murder.
The facts relevant to this issue are as follows. Several months after the homicide, Hollis Braxton and Rico Lee told the police that they saw the defendant shoot the victim during an armed robbery attempt. At the defendant's first trial, Braxton and Lee appeared as state witnesses and gave testimony identifying the defendant as the murderer, which was consistent with their prior statements.
On September 17, 1996, the state filed a Brady notice, informing the defendant that on September 16, 1996, Braxton and Lee told the assistant district attorneys that they were not present during the murder, and that they were in Laplace when it happened. Braxton and Lee also said that they did not find out about the murder until the next day. According to the notice, Braxton and Lee then said that this story was not true, and that they had attempted to recant their statements and testimony because they were afraid. Finally, by the end of the conversation Braxton and Lee re-confirmed that their prior statements and testimony were actually true.
Defendant then filed a motion in limine to exclude Lee and Braxton as witnesses, asserting that their testimony would be perjury. The trial court held a hearing to *64 consider the argument presented by the state and the defense. The court denied the motion, reasoning that there was no basis to believe that Braxton and Lee would commit perjury since they ultimately said their testimony and prior statements were actually true.
At trial, however, both Braxton and Lee recanted their prior statements and prior sworn testimony. After Braxton and Lee testified that they were in Laplace at the time of the murder, and denied any knowledge of the defendant's involvement in the murder, the assistant district attorney read portions of their prior testimony and asked if the testimony was true. Both Braxton and Lee testified that their prior testimony was a lie and both admitted that they had given the statements to Captain Hay, but testified that they were "coached" into making the statements.
The record reflects that Braxton and Lee's video/audio taped statements were played for the jury and transcripts of their prior testimony were handed out for the jury to read. Defendant argues that the trial court erred in allowing this evidence to be presented to the jury as substantive evidence of defendant's guilt and not limiting it to impeachment evidence. Absent this evidence, defendant contends that there is no evidence of his guilt.
On appeal, where sufficiency of the evidence under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) is raised, as well as issues relating to the erroneous admission of evidence, the appellate court must first consider all of the evidence introduced at trial, even evidence which the trial court may have admitted erroneously. If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to the trial errors is necessary. If, however, the appellate court finds that the totality of the evidence presented satisfied the Jackson standard, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the court's error requires reversal of the conviction or was harmless. State v. Lamothe, 98-2056 (La.11/25/98), 722 So.2d 987; State v. Hearold, 603 So.2d 731, 734 (La.1992).
Based on the foregoing jurisprudence, the sufficiency of the evidence, both admissible and possibly inadmissible, is first considered. The defendant was convicted of second degree murder, which is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm or "when the offender is engaged in the perpetration or attempted perpetration of armed robbery ... even though he has no intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1) and (2)(a). Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Graham, 420 So.2d 1126, 1127 (La.1982); State v. Andrews, 95-129, p. 2 (La.App. 5th Cir. 11/15/95), 665 So.2d 454, 456.
The evidence against the defendant consisted primarily of the transcripts of Braxton and Lee's sworn testimony at the defendant's prior trial and their statements to Captain Hay. The videotapes of both Braxton and Lee's statements were played for the jury and transcripts were given to them to follow along. In their statements, they told Captain Hay that they had seen the defendant demand money from the victim, and when the victim did not give the defendant money, the defendant shot him at close range. Braxton told Captain Hay that the defendant, Ernest Washington, also known as "Snow", and Rico Lee picked him up in the victim's car as he was walking in front of Mertle Ann's lounge late that Saturday night. Braxton stated that they first went to the victim's house, *65 and while Braxton and Lee waited in the car, the defendant and Washington went inside. They returned with the victim, who sat between the defendant, who was driving, and Washington, who was in the front passenger's seat. During the ride, Washington was rubbing the victim's back and head. The victim was known to be a homosexual. Braxton said that the defendant then demanded money from the victim and stopped the car. The defendant ordered the victim out of the car. According to Braxton, the defendant pointed a gun at the victim and continued to demand money, but the victim told the defendant that he did not have any money. Braxton said the defendant got in and out of the car at least once and struck the victim in the mouth. According to Braxton, Washington told the defendant to "do it," which Braxton interpreted to mean to shoot or rob the victim. Braxton said that the victim told the defendant to put that "fake thing" away, and then the defendant shot the victim in the back of the side of his head. Braxton said that the defendant was sitting in the car and the victim was leaning into the car when he was shot. Braxton said that the gun was a .38 because of the loud sound. After the shooting, the defendant checked the victim's pockets looking for money, but Braxton said that he did not have anything in his pockets. Braxton said that the defendant entered the car and drove them to the Reserve Project where someone in the car asked for Clarence Bolden, also known as "Country," for the purpose of disposing of the gun. Thereafter, Braxton got out of the car in Garyville and before he left, he was told not to say anything about what had happened.
Lee's statement is in agreement with most of Braxton's statement, but differs in a few details. Lee initially stated that he got into the car with the defendant and Washington around 6:00 p.m., but said later that he really did not know what time it was, and stated that the time might have been between 10:00 p.m. and 10:30 p.m. Another difference is that he described going to the Reserve Project and talking to Allen Holland before going to the victim's house. However, his statement thereafter coincides with the substance of Braxton's statement, in particular with the defendant demanding money from the victim, and then the defendant's shooting him when he did not give him money. In the portion of Hollis Braxton's prior testimony referred to at trial, Braxton said that he was in the car with "Snow," Rico Lee, the defendant, and the victim. Braxton said that he was sitting in the back seat, on the passenger's side. Braxton said that "Snow" and the defendant took the victim out of the car and "Snow" said, "Do it." According to Braxton's prior testimony, the defendant hit the victim in the face and he also stated that he saw the defendant holding a .38 caliber black gun with a brown handle. Braxton also said that "it looked like it was going to be a robbery, because they ["Snow" and the defendant] were asking for money, but it turned out to be worst (sic) than that."
Allen Holland's testimony and Cleveland Carter's testimony established that Braxton, Lee, Washington and the defendant were in the victim's car that night. Both Holland and Carter testified that they saw the defendant in the victim's vehicle on the night of the murder after midnight, along with Ernest Washington, Rico Lee, and Hollis Braxton. Captain Hay's testimony, about Braxton and Lee's statements, established that the four were in the victim's car on the night of the murder with the victim.
The defendant sought to establish an alibi defense. Burna Washington testified that the defendant was at her lounge, the Streamline Bar, in Lutcher between 8:00 p.m. and 9:00 p.m. on the night of the homicide. Gregory Morris also testified that he saw the defendant at the Streamline Bar that night after 10:30 p.m., and that the defendant was still there when Morris left at 3:00 a.m. He testified that he did not recall seeing Washington, Braxton, *66 Lee or Jackson at the Streamline Bar that night. Tremaine Joseph, the defendant's cousin, testified that he arrived at the Streamline Bar that night between 10:00 p.m. and 11:00 p.m. He testified that he went there to celebrate his birthday and that he saw the defendant standing by the door as he entered the bar. Mr. Joseph said that he left at 2:00 a.m., and did not know if the defendant was still there at that time. He testified he saw Greg Morris there also.
The defense also attempted to show that Lee, Braxton, and Washington were elsewhere that night. Corey Edwards testified that he, Albert Noble, and Clarence Noble were roommates. He stated that they had a party for Clarence that night and that Lee, Braxton, and Cleveland Carter were there. He testified that Cleveland Carter left around 10:00 p.m., but that Lee and Braxton stayed overnight. Albert Noble likewise testified that Lee and Braxton stayed the night and he brought them home the next day after church. Danielle Coleman testified that she was at her godmother's house in Reserve on the night of the homicide. She stated that Washington and his fiancee, Tammy Coleman, were also there, and that the three of them were helping her recover from eye surgery. Ms. Coleman testified that they all spent the night at her godmother's house. The godmother's medical records were introduced into evidence to establish that she had eye surgery on January 22, 1991, a few days before the murder.
The only other possible evidence linking the defendant to the crime besides Braxton and Lee's statements was the testimony of Cleveland Carter, Allen Holland, and Captain Hay. Holland's testimony placed the defendant in the victim's car with Braxton, Lee, and Washington, and Captain Hay's testimony placed defendant in the car with Braxton, Lee, Washington, and the victim.
Based on the foregoing, we find that a rational trier of fact could have concluded beyond a reasonable doubt that the defendant committed the second degree murder of Mullin Dinvaut. Braxton and Lee's statements, when considered with other admissible evidence, provide an evidentiary basis sufficient to support the defendant's conviction. Defendant is not entitled to an acquittal under Jackson v. Virginia, supra.
Next, we must consider the question of whether the trial court erred in admitting into evidence, and allowing it to be used as substantive evidence of defendant's guilt, the prior testimony and video/audio statements of witnesses Braxton and Lee. The defense argues that the statements and testimony are inadmissible hearsay and could only be considered for the limited purpose of showing the witnesses' lack of credibility.
Hearsay is defined by La. C.E. art. 801(C) as a "statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible except as provided by law. La. C.E. art. 802. La. C.E. art. 607(D)(2) provides that a prior inconsistent statement, even though it is inadmissible hearsay, may be introduced into evidence for the limited purpose of attacking the credibility of a witness. More importantly, however, La. C.E. art. 801(D)(1)(a) provides that some out-ofcourt statements are not hearsay:
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) Inconsistent with his testimony, and was given under oath subject to the penalty of perjury at the accused's preliminary examination or the accused's prior trial and the witness was subject to cross-examination by the accused;
*67 In State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065, the Louisiana Supreme Court acknowledged the use of prior inconsistent statements as substantive evidence under La. C.E. 801(D)(1)(a) in discussing the development of Articles 801 and 607:
When Federal Rules of Evidence 607 and 801 were initially promulgated, the advisors proposed a broad rule of impeachment (i.e., attacking credibility) of a witness by the party calling the witness, as well as the use of any prior inconsistent statement of the witness as substantive evidence of that previous statement. That scheme did not require the party calling the witness to be surprised or unaware that the witness would give unfavorable testimony. The party, in effect, had the right to present a turncoat witness and also to present the witness' inconsistent prior statement as substantive evidence, thereby allowing the jury to decide which statement, the trial testimony or the prior inconsistent statement, was the truth. (Citations omitted).
However, in the process of amending and eventually adopting Rule 801, Congress rejected the broad doctrine of substantive use of all prior inconsistent statements and restricted the substantive (or non-hearsay) use to those statements which were "inconsistent as to the declarant's testimony and [were] given under oath...." The "given under oath" requirement significantly limited the substantive use of such statements to statements given, for example, in a deposition or to a grand jury.
When the Louisiana State Law Institute proposed the Louisiana Code of Evidence to the Legislature, the substantive impeachment rule was even further restricted. Only those inconsistent statements that were given in "the accused's preliminary hearing or ... prior trial [where the] witness was subject to cross examination by the accused" are classified as non-hearsay and admissible as substantive evidence. La. Code La. C.E. art. 801 D(1)(a). Otherwise, prior inconsistent statements are only admitted to impeach or to contradict the witness's trial testimony, i.e., solely to discredit the witness; these statements cannot be used to divulge the content of the prior statement for the purpose of inviting the jury to believe the content of the statement. La.Code La. C.E. art., art. 607 D(2).
Id., at 1069. (Emphasis added).
In the present case, we find that the transcripts of Braxton and Lee's testimony at the defendant's prior trial, which were admitted as State's exhibits 24 and 25 at the instant trial, are exactly the type of prior inconsistent statements contemplated by Article 801(D)(1)(a). Braxton and Lee testified at the defendant's first trial under oath and subject to the penalty of perjury. They were cross-examined by the defendant's trial counsel, and this testimony was inconsistent with their testimony at the defendant's second trial. Therefore, the transcripts of the testimony given by Braxton and Lee at the prior trial are not inadmissible hearsay and the trial judge properly admitted the transcripts as substantive evidence of the defendant's guilt.
Braxton and Lee's statements given to Captain Hay do not, however, fit within the Article 801(D)(1)(a) exception and were erroneously admitted into evidence and allowed to be considered as substantive evidence of defendant's guilt. Their admission into evidence should have been limited to attacking the credibility of the witnesses. However, we find the failure of the trial court to advise the jury that these statements should be considered solely for the purpose of establishing the witnesses' lack of credibility, was harmless error since they were merely cumulative of the witnesses' admissible testimony from the first trial.
Finally, defendant contends that the trial court erred in allowing the prosecutor to call Braxton and Lee merely to *68 impeach them with the inadmissible evidence.
The record does not support the defense argument on this point. As noted above, in the Brady statement provided defense counsel, Braxton and Lee recanted their earlier eyewitness statements, but by the end of the meeting they were again acknowledging their eyewitness account of the murder by the defendant. Thus, in fact, the prosecution did not know what the witnesses would say when called to the stand. Moreover, as we determined above, the transcripts of the witnesses' testimony from the prior trial was admissible.
These assignments of error have no merit.

ASSIGNMENT OF ERROR NUMBER 5
By this assignment of error defendant argues that the trial court erred in not advising the defendant on the record of his right to "conflict-free" counsel and insuring that defendant was knowingly waiving this right. Defendant's argument on this point relates to the fact that defendant's trial counsel in his second trial formerly represented the codefendant, Ernest Washington, in the first trial. The charges against Washington had been "nol prossed" but could have been reinstated.
The state notes that counsel was retained by defendant with full awareness that she had represented his codefendant in the prior trial. Further, while defendant makes reference to counsel not being "conflict-free" he does not specify what if any conflict there was.
Representation of codefendants in not per se illegal and does not violate the Sixth Amendment to the United States Constitution of Article I, Section 13, of the Louisiana Constitution unless it gives rise to a conflict of interest. State v. Kahey, 436 So.2d 475 (La.1983). When the trial court has no reason to believe that a conflict of interest exists, its failure to inquire into the propriety of joint representation or to advise a defendant of the right to conflict-free representation is not in itself a denial of any constitutional rights. State v. Castaneda, 94-1118, pp. 4-5 (La.App. 1st Cir. 6/23/95), 658 So.2d 297, 301; State v. Matthews, 98-252 (La. App. 5th Cir. 10/14/98), 720 So.2d 153. Unless a trial court knows or reasonably should know that a conflict of interest exists, the trial court need not initiate an inquiry. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).[3]
Defendant does not detail any conflict of interest that trial counsel may have had, nor is one apparent from the record. The charges against Washington had been dropped prior to defendant's re-trial. There is no showing of antagonistic defenses. The record does not support defendant's claim that the trial judge was alerted to any special circumstances involving his attorney's representation of him and her former representation of Washington such that she should have initiated inquiry into the matter.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER 6
By this assignment of error defendant argues that the trial judge erred in allowing Braxton and Lee to be "Mirandized," *69 at the prosecutor's request, in front of the jury when they testified favorably to the defense and in not, thereafter, granting a mistrial.
Lee took the stand first and testified that the testimony he gave under oath at the defendant's first trial was a lie and that his prior statement was coached. In the presence of the jury, the prosecutor then requested that one of the officers read Lee his Miranda rights. Defense counsel stated that she had no objection. Lee was then read the Miranda rights. Following that, Lee asked for an attorney and the court recessed. Out of the presence of the jury, the judge discussed with defense counsel the fact that Lee's exercising his privilege against self-incrimination would severely limit her right of cross-examination. Defense counsel then indicated that she would proffer her questions, whether Lee answered them or not. After the jury returned, questioning resumed and when the prosecutor asked Lee if he had perjured himself, the trial judge told Lee that he did not have to answer any further questions. Out of the jury's presence, the court cited Lee for contempt of court, and he was taken into custody. The trial judge then asked the prosecutor if they were "going to go through the same thing with the next witness," and the prosecutor said that he did not know.
Braxton then took the stand and likewise testified that his prior testimony was a lie and his prior statement was coached. The prosecutor again requested Miranda warnings, and defense counsel again did not object. The warnings were given. Out of the jury's presence, defense counsel then made a motion for a mistrial on the basis that defendant's right of cross-examination and confrontation were violated and also on the ground that the state called witnesses that they knew were going to recant their prior testimony and perjure themselves. The court denied the defendant's mistrial motion.
After some discussion, the state stipulated that it would agree to a grant of limited immunity to afford the defendant his full right of cross-examination of Lee and Braxton and to avoid the necessity of a mistrial. Defense counsel did not thereafter re-urge her mistrial motion and the record reflects that defense counsel vigorously cross-examined both Braxton and Lee.
Because the defense counsel failed to raise a contemporaneous objection to Braxton and Lee's receiving Miranda warnings in front of the jury, she has waived the right to argue this issue on appeal. La.C.Cr.P. art. 841; State v. Styles, 96-897 (La.App. 5th Cir. 3/25/97), 692 So.2d 1222, 1228. Therefore, this objection, raised for the first time on appeal, will not be considered.
Additionally, our review of the record indicates that defendant abandoned his mistrial motion by acquiescing in the procedure proposed by the prosecutor, granting limited immunity to enable cross-examination. The mistrial motion was made based on defense counsel's allegation that defendant was denied his right to cross-examine Braxton and Lee, since they had invoked their Fifth Amendment privileges. With the limited grant of immunity, however, defendant was no longer denied his right of cross-examination. Defense counsel acquiesced in this procedure and did not re-urge the mistrial motion, but rather proceeded with a lengthy cross examination of the witnesses. Accordingly, we find no issue preserved for appellate review under this assignment of error.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER 7
By this assignment of error defendant argues that the trial court committed reversible error in giving an erroneous charge to the jury regarding the applicable sentence for second degree murder. More particularly, the trial judge erroneously charged the jury as to the applicable sentence by instructing them that the sentence for second degree murder was life imprisonment without the benefit of parole, *70 probation or suspension of sentence for twenty years. In fact, the correct penalty is life imprisonment without benefit or parole, probation or suspension of sentence for the entire sentence. Defendant argues that this error in the charge constitutes reversible error because in returning a guilty verdict to second degree murder rather than to manslaughter, on which the jury was also charged, the jury did so based on the misinformation that defendant could be parole eligible in twenty years.
There is no question, and the state concedes, that the information given the jury concerning the defendant's parole eligibility was incorrect. The state argues, however, that the error was harmless.
When the penalty imposed by the statute is a mandatory one, the trial judge must inform the jury of the penalty upon request of the defendant and must permit the defense to argue the penalty to the jury. State v. Jackson, 450 So.2d 621 (La. 1984); State v. Washington, 367 So.2d 4 (La.1978); State v. Prater, 337 So.2d 1107 (La.1976). Prior to Prater, the court reasoned that sentencing, which was within the sole province of the judge, was not a concern of the juries' and, therefore, they did not need to be informed of the sentencing provisions. In Prater, however, the court drew a distinction where the sentence was mandatory, because, in those cases, the jury verdict did control the sentence.
Here, the defendant did not request the charge, but objected when the trial judge read the erroneous instruction.
The jury instruction in this case was partially incorrect insofar as it advised the jury that defendant would be parole eligible in twenty years. Nevertheless, an incorrect jury instruction is subject to a harmless error analysis. In order to determine harmless error, the proper analysis is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the instant trial was surely unattributable to the error." State v. Jynes, 94-745 (La.App. 5th Cir. 3/1/95), 652 So.2d 91, at 98.
In this case, the jury was properly advised that if they returned a guilty verdict to the charge of second degree murder that the defendant would be sentenced to life in prison. Any prospect of defendant being released on parole is speculative at best and certainly not within the province or control of the jury. Moreover, the evidence presented, that the unarmed victim was shot without provocation, clearly mandated the guilty verdict to second degree murder rather than to manslaughter. Therefore, we find that the guilty verdict returned by the jury in this case was surely unattributable to the minimal error in the penalty instruction.
This assignment of error has no merit.

ASSIGNMENTS OF ERROR NUMBERS 8-11.
These assignments of error are considered together because they are interrelated, all arguing that counsel was ineffective. More specifically, in assignment of error number 8 defendant argues that counsel was ineffective in deciding to represent him after representing the codefendant in the earlier trial; in assignment of error number 9 defendant argues that counsel was ineffective in failing to request an instruction that the statements of Braxton and Lee were only to be considered as impeachment material and not as substantive evidence of the crime; in assignment of error number 10 defendant argues that counsel was ineffective in not objecting to the "Mirandizing" of Braxton and Lee and in not persisting in her mistrial request; and in assignment of error number 10 defendant argues that counsel was ineffective in not timely moving for an appeal.
The Louisiana Supreme Court has held that a claim of ineffective assistance of counsel is most appropriately addressed through an application for post conviction *71 relief rather than direct appeal, so as to afford the parties an evidentiary hearing before the trial court and create an adequate record for review. State v. Truitt, 500 So.2d 355 (La.1987); State v. Brumfield, 96-2667, p. 14 (La.10/2/98), 737 So.2d 660. However, where the record contains sufficient evidence to decide the issue, and the issue is properly raised by assignment of error on appeal, it may be addressed in the interest of judicial economy. State v. Peart, 621 So.2d 780 (La.1993); State v. Junior, 542 So.2d 23 (La.App. 5 Cir.1989), writ denied, 546 So.2d 1212 (La.1989).
After reviewing defendant's claims of counsel's ineffectiveness and the record before us, we find that the record lacks sufficient evidence to decide the issue on appeal, particularly, concerning the claim that counsel was ineffective because she had a conflict of interest. As stated above, the record before us does not readily evidence a conflict of interest in trial counsel's representation of defendant in this case after representing the codefendant in a prior trial. If there is some reason that trial counsel's representation of defendant herein was compromised, evidence of that must be fleshed out in an evidentiary hearing. Defendant's claims of trial counsel's ineffectiveness, where the record lacks sufficient evidence to decide the issue, are most appropriately addressed through an application for post conviction relief to afford the parties an opportunity to conduct an evidentiary hearing before the trial court and create an adequate record for review of the issue. Therefore, we decline to address this issue on appeal.
These assignments of error are not considered in this appeal.

ASSIGNMENT OF ERROR NUMBER 12
By this assignment of error defendant argues that his conviction should be reversed because of prosecutorial misconduct. More particularly, defendant argues that the prosecutor was guilty of gross misconduct which prejudiced the verdict by putting Braxton and Lee on the stand believing that they would give false testimony so that the state could introduce the prior statements and testimony of the witnesses to prove defendant's guilt. Additionally, defendant argues that the prosecutor was guilty of misconduct in not instructing these witnesses to seek the assistance of counsel prior to being called to testify.
As discussed previously, a hearing was held outside of the presence of the jury on the defendant's motion in limine to prevent Braxton and Lee from testifying. At that hearing the prosecutor informed the court that Braxton and Lee had at one point recanted their prior testimony and statements, stating that they were not present during the commission of the murder as previously stated. The pair ultimately admitted to the prosecutor that their original testimony and statements were true and that they were only attempting to recant because they were afraid. The prosecutor informed the judge that he had no reason to think that the two men were not going to tell the truth when called to testify. Pursuant to this hearing, in denying the defendant's motion, the court found that the prosecutor had been forth coming with all information concerning these two witnesses and at this time, there was no way of knowing what they would say when they took the stand.
When Braxton and Lee took the stand they stated that the testimony they gave under oath at the first trial as well as the statements they gave to the police were false. As discussed previously, the prosecutor then used the prior testimony and statements of these witnesses to impeach them.
Based on the foregoing, we find no prosecutorial misconduct involved in these proceedings and certainly none that would require a reversal of the conviction.
This assignment of error has no merit.

*72 ASSIGNMENT OF ERROR NUMBER 13
By this assignment of error defendant argues, on double jeopardy principles, that upon finding reversible error in this appeal, this court should bar any re-prosecution of defendant.
Since we find no reversible error in this case, the arguments raised by this assignment of error are moot.
This assignment of error has no merit.

ERROR PATENT
We have reviewed this case for errors patent and find that the trial court erred in failing to properly advise the defendant of the prescriptive period for post conviction relief. Paragraph C of La.C.Cr.P. art. 930.8 instructs the trial judge to inform the defendant at the time of sentencing of the prescriptive period for post conviction relief.
In the present case, when the trial judge sentenced defendant, she only advised him that he had a three year prescriptive period within which to file an application for post conviction relief. More accurately, defendant should have been informed that he has three years after the judgment of conviction and sentence has become final. State v. Carter, 96-358 (La.App. 5th Cir. 11/26/96), 685 So.2d 346.
Therefore, we instruct the trial court to send appropriate written notice to defendant of the correct statement of the law regarding the prescriptive period for post conviction relief and to file written proof in the record that defendant received the notice. See. State v. Kershaw, 94-141 (La. App. 5th Cir. 9/14/94), 643 So.2d 1289.
Accordingly, for the reasons set out above, we affirm defendant's conviction for second degree murder and his sentence to life in prison without benefit of parole, probation or suspension of sentence. The case is remanded to the district court to provide proof in the record of defendant's receipt of appropriate notice, under La. C.Cr.P. art. 930.8, of the prescriptive period for post conviction relief.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.
NOTES
[1] While Captain Hay testified that the date he interviewed Rico Lee was February 24, 1992, the date reflected on the statement is January 24, 1992. (R. pp. 1000, State's exhibit 21).
[2] These statements and prior testimony are the subject of assignments of error numbers one through four.
[3] It is noted that after defendant's trial, by Acts 1997, No. 889, § 1, the Louisiana Legislature added La.C.Cr.P. art. 517, which provides:

Art. 517. Joint representation of co-defendants; duty of court
A. Whenever two or more defendants have been jointly charged in a single indictment or have moved to consolidate their indictments for a joint trial, and are represented by the same retained or appointed counsel or by retained or appointed counsel who are associated in the practice of law, the court shall inquire with respect to such joint representation and shall advise each defendant on the record of his right to separate representation.
B. Unless it appears that there is good cause to believe that no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.