822 So.2d 849 (2002)
STATE of Louisiana
v.
Daniel E. DICKERSON.
No. 01-KA-1287.
Court of Appeal of Louisiana, Fifth Circuit.
June 26, 2002.
*851 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Daniel E. Dickerson, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, District Attorney, 24th Judicial District Court, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Thomas J. Butler, Assistant District AttorneysAppellate Counsel, Donald A. Rowan, Douglas W. Freese, Assistant District Attorneys Trial Counsel, Gretna, LA, for State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
On May 6, 1999, the Jefferson Parish grand jury indicted defendant, Daniel E. Dickerson, for aggravated rape. Defendant was arraigned on May 17, 1999 and pled not guilty. On November 30, 1999, the State noticed its intent to seek a capital verdict pursuant to La. R.S. 14:42(D)(2)(a). On September 8, 2000, the State amended the bill of indictment to allege that the crime occurred on or between June 2, 1998 and July 21, 1998.
On January 23, 24, 25, 26, and 27, 2001, trial was held. After deliberations, the 12-member jury unanimously found defendant guilty as charged. On January 29, 2001, the jury was unable to reach a unanimous verdict to recommend the death penalty for defendant; and, therefore, the trial judge discharged the jury.
On February 22, 2001, the trial court denied defendant's motion in arrest of judgment and motion for new trial. That same day, defendant waived sentencing delays and the trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant verbally objected to the sentence and timely moved for an appeal and reconsideration of sentence. The motion for reconsideration of sentence was denied but the motion for appeal was granted.

Facts
In May of 1998, A.R.,[1] who is the victim's mother and the defendant's daughter, allowed three of her children, including D.R. and her then three-year-old twin siblings, to stay with her father and his live-in girlfriend, Edna Joseph ("Edna"), for the summer. D.R. was four-years-old when she went to stay with "Paw Paw *852 Danny" and "Grandma Edna."[2] She turned five-years-old on June 30, 1998.
A.R.[3] stated that the defendant asked A.R. if the twins and D.R. could come and spend the summer with him and Edna. A.R. saw her children on the weekends while they were staying with defendant and Edna. One day in late July of 1998, A.R. and her oldest daughter were at the defendant's house visiting with her children. Her oldest daughter told A.R. that D.R. and defendant "had been getting booty."
When A.R. called Edna and D.R. into the room, D.R. recounted that, there was at least one occasion when, she was sitting on the sofa downstairs and defendant, "Paw Paw Danny," told her siblings and Edna to go upstairs. Defendant then told D.R. to lie on the floor, pulled her underwear aside and put his private part in her private part. When she told him she had to go to the bathroom, defendant followed her into the bathroom and "did it again." Next, D.R. went into the kitchen. Defendant followed her in there, put her on the counter, put his "private part in her butt" and started "humping" on her and "shaking." D.R. testified that she was very scared and it hurt when defendant did that. She also stated that no one else saw those things happen.
According to D.R., defendant told her that, if she didn't tell anyone what had happened, he would give her anything she wanted. He also told her that if she did tell, he would "whup" her and not give her anything. Although she was afraid, D.R. told her older sister about the things defendant was doing to her. D.R.'s older sister then told their mother what had happened. When her mother found out, D.R.'s mother told her to tell Edna, which D.R. did. When D.R. told Edna what defendant had done to her, Edna denied the events.
After D.R. told A.R., A.R. called the police. Deputy Robert Fox of the Jefferson Parish Sheriff's Office responded to a rape complaint on July 29, 1998 at 1586 Abbey Road, Apartment A, in Jefferson Parish and spoke to A.R. and Edna. Deputy Fox stated that A.R., the mother of the victim, was crying and upset, so he spoke to Edna who told him that the rapes occurred between July 11 and 14. Deputy Fox testified that Edna seemed unhappy that the police were there and was evasive when asked questions. When Deputy Fox questioned D.R., she told him that her grandfather, defendant, had touched her vagina with his penis. Deputy Fox prepared a report regarding his investigation of the crime.
Sergeant Kelly Jones of the Jefferson Parish Sheriff's Office, Personal Violence Section also responded to the rape complaint on July 29, 1998. She met with A.R., Edna, D.R. and D.R.'s two younger siblings. A.R. told Sergeant Jones that D.R. told her "Paw Paw Danny had been getting booty" with D.R. Edna seemed to be somewhat agitated at Sergeant Jones' presence. She was uncooperative, evasive, and her responses to questions were vague. Edna told Sergeant Jones defendant was offshore between July 11, 1998 and July 14, 1998. She also told Sergeant *853 Jones that she didn't believe that defendant had molested D.R.
Sergeant Jones also spoke with D.R. that day. D.R. told Sergeant Jones that "Paw Paw Danny had put his bird" in her "private." When D.R. stated her "private" area, she pointed to her genital area. D.R. stated that this activity had occurred in various locations in his house.
On August 3, 1998, Sergeant Jones escorted A.R. and D.R. to an interview with Omalee Gordon of the Gretna Police Department, Children's Advocacy Center regarding allegations of sexual abuse. Sergeant Jones monitored the interview from a monitoring room connected to the interview room. The interview was videotaped. Ms. Gordon stated that the videotape accurately depicted the interview. At trial, D.R. remembered that she went to see a lady who made a video of the two of them talking together and that she had told the lady the truth on the video. The videotape of the interview was introduced at trial and played for the jury.
In the videotape, D.R. stated that Paw Paw Danny (defendant) had put his "bird" in her "private part" and pointed to her genital area. D.R. said that defendant had done that on the sofa, on the bed, in the bathroom and in the kitchen at "Grandma Edna's house." She stated that her brother, her sister, and Grandma Edna were upstairs when it happened. D.R. said that when defendant heard Grandma Edna coming downstairs, he stopped what he was doing. D.R. stated that defendant told her if she told anyone about what he was doing to her, that he would "whoop" her, and that if she didn't tell anyone, he would give her anything she wanted.
She indicated on the videotape how defendant had moved her underwear aside so he could put his "bird" in. D.R. stated that defendant first did those things when she was four years old, and that he last did those things when she was five years old. She also said that defendant had put his "bird in her booty." She said that she was four years old when defendant first abused her, and that she was five years old the last time.
On the videotape, D.R. got on her hands and knees to demonstrate what defendant had done. D.R. testified that her mother visited them the night the incidents occurred and that the police were called the next morning. D.R. told her mother what defendant had been doing to her then D.R. told Ms. Joseph. Her mother called the police and defendant never abused D.R. anymore. During the interview, D.R. indicated on a drawing of a male and a female where defendant had touched her.
In August of 1998, Sergeant Jones obtained a warrant for defendant's arrest. Because he could not be located, he was not arrested until February of 1999. At trial, Sergeant Jones testified that, when she filled out her supplemental police report of the incident, she mistakenly indicated in that report that the dates of the rapes were July 11 through July 14. At trial, she indicated that July 11 through July 14 was actually the period of time that Edna indicated that the defendant was working offshore. Sergeant Jones testified that she viewed the videotape of Gordon's interview with D.R., and that the video was entirely consistent with the events related to her on July 29, 1998 and August 3, 1998.
On September 18, 1998, D.R. was referred to Dr. Scott Benton, an expert in the fields of pediatric forensic medicine and child sexual abuse, by the Jefferson Parish Children's Advocacy Center for a sexual abuse evaluation. Dr. Benton testified that D.R.'s physical exam was abnormal. During the exam, he found healed burns on the back of her left knee and *854 right calf, which D.R. said were caused by a friend's curling iron, and a narrowed hymen, which is abnormal for a four-year-old child. He stated that a narrowed hymen is not a definitive sign of sexual abuse. Further, the fact that the hymen was still present did not mean that there was no penetration by a penis or some other object. Although the examination of D.R.'s anus revealed that it was normal, that finding did not mean that her anus had not been penetrated by a penis or some other object.
He further testified that the vast majority of child sexual abuse cases did not have physical findings. Dr. Benton stated that, in his experience of seeing thousands of children, it was common that the vast majority delay in making a report for two reasons. First, children didn't understand that the abuse is not accepted by society. Second, the abusers seduced and/or intimidated the child. Dr. Benton testified that, in the case of a child who had been vaginally and anally raped, he would expect to find that the child had a normal physical examination and no evidence of the rape. Dr. Benton stated that child sexual abuse tends to be more gentle when "it is within a familiar component, and that gentleness generally leads to a lesser chance of seeing any evidence." He also testified that the skin around the vagina and anus heals rapidly.
At trial, the defense called two witnesses, Tracy Meyers and Edna Joseph. Ms. Meyers is the custodian of records for Art Catering, defendant's former employer. She stated that defendant worked for Art Catering from May 14, 1998 until November 30, 1998. Ms. Meyers testified that defendant was working offshore for Art Catering from June 20, 1998 through July 13, 1998 and from July 21, 1998 through July 29, 1998. She stated that defendant would be home on the day after he had left the rig. Ms. Meyers testified that defendant did not work any day between May 28, 1998 and June 19, 1998, nor did he work any day between July 14, 1998 and July 20, 1998.
Edna Joseph testified that she had known defendant for ten years. In 1997, she and defendant, who were romantically involved, moved into an apartment together on Abbey Road. In 1997, she was working full-time as a personal care attendant. In 1998, she and defendant were contacted by defendant's daughter, A.R., about her children. A.R. talked to Edna about taking her children because she was having "a bad time." Edna told A.R. they would gladly take care of her children, the three-year-old twins and D.R.
According to Edna, the children moved in on April 12, 1998. She remembered that date because she quit her job that day so she could stay home with the children. At that time, defendant went to work for Art Catering, cooking and cleaning up. Edna testified that on one occasion, D.R. and D.R.'s sister said they saw their mother in bed with "Fred" "getting booty." D.R. then "got down on all fours" and twirled her buttocks.
While A.R.'s children lived with them, Ms. Joseph bathed the children, cooked for them, did their laundry and played with them. When A.R. and D.R. claimed that defendant had abused D.R., Edna said that it didn't happen and that A.R. should call the police. Edna claimed she did not tell the police officers that the alleged abuse occurred between July 11 and July 14, but that A.R. did. Edna denied that she was evasive or uncooperative with the officers.
Edna testified that D.R. never cried when in defendant's presence. Edna never saw defendant doing anything inappropriate with D.R., she never saw defendant on top of D.R., D.R. never complained to Edna about any problems with her private *855 area, D.R. never appeared to have been injured, and there was not enough room on Edna's kitchen counter for defendant to have had sexual intercourse with D.R. Edna claimed that, on July 29, D.R. did not come out of the bathroom and tell her and A.R. that "Paw Paw Danny had gotten booty from her." Edna stated that D.R. may have falsely accused defendant of rape, because A.R.'s mother, D.R.'s grandmother, Mary Riley, intensely disliked defendant because he had married another woman. Edna admitted on cross-examination that she and A.R. were talking about the July 11 to July 14 dates before A.R. told the police about them. She also stated that she did not tell Sabrina Charles that the police should not be involved in a family matter.
Sabrina Charles, defendant's daughter, A.R.'s sister and D.R.'s aunt, was called as a rebuttal witness by the State. She received a telephone call from A.R. on July 29, 1998. On that day, Ms. Charles also spoke to D.R. and Edna. Edna told Ms. Charles that Ms. Charles shouldn't have called other family members and let them know about the abuse allegations but that they should have handled the matter among themselves. Edna also said that the police should not have been called either. Ms. Charles testified that she and Edna were both very angry and shouting obscenities at one another during the conversation.

Discussion
Defendant has raised issues on appeal regarding sufficiency of the evidence, erroneous exclusion of evidence, and erroneous admission of evidence. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339. Accordingly, we will first address defendant's argument that the evidence was insufficient to support the verdict.
Defendant argues that the evidence was legally insufficient to support the verdict. In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305 (La.1988).
*856 In the instant case, defendant was convicted of aggravated rape in violation of La. R.S. 14:42(A)(4), which, in pertinent part, provides:
Aggravated rape is a rape committed... where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one of the following circumstances:
. . . .
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
La. R.S. 14:41 defines a rape as:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
Defendant contends that the only evidence supporting guilt was the uncorroborated testimony of the seven-year-old child victim, D.R., who was recounting events that occurred immediately preceding and following her fifth birthday. D.R. testified at trial that defendant put his "private part in her private part." She stated that this occurred in Edna's house on the floor downstairs, in the bathroom, and in the kitchen. D.R. testified that, when they were in the kitchen, defendant put his "private part in her butt." The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243 (La.App. 5 Cir.11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and 2000-150 (La.6/30/00), 765 So.2d 1066 (and the citations therein).
Second, defendant claims that the child was impeached when it was shown she was mistaken or deceitful about the dates of the alleged rapes. Defendant points out inconsistencies between the victim's testimony and other witnesses' testimony regarding the dates of occurrence. D.R. stated that all of the above incidents had occurred on the night before the police were called, which would have been July 28, 1998. Her testimony, however, was contradicted by Ms. Meyers who stated that defendant was working offshore from July 21, 1998 through July 29, 1998 and would not have gotten home until July 30, 1998.
Here, the jury heard the conflicting testimony of the victim and Meyer's regarding these dates, yet found the victim's story credible. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of witnesses will not be reweighed on appeal. State v. Hotoph, 750 So.2d at 1045.
Importantly, D.R. testified that her birthday was June 30, and that she was four years old when defendant first abused her, and five years old the last time. Further, Meyers testified that defendant was not working any day between May 28, 1998 and June 19, 1998, nor did he work any day between July 14, 1998 and July 20, 1998. It is clear from the victim's testimony that the abuse occurred more than one time, both before and after her fifth birthday. Defendant was not working offshore for at least three weeks preceding the victim's birthday and at least one week after her fifth birthday. Therefore, the evidence, as a whole, reflects that the abuse could have occurred on or between June 2, 1998 and July 21, 1998, the dates set forth in the amended indictment.
*857 Next, defendant claims that the child testified that defendant abused her in a manner suggestive of aggravated rape, but that digital penetration could not be excluded as the activity described by the child, which would not constitute aggravated rape. Contrary to defendant's assertions, there was no evidence presented that the penetration was only digital. Again, D.R. testified at trial that defendant put his "private part in her private part." She stated that this occurred in Edna's house on the floor downstairs, in the bathroom, and in the kitchen. D.R. testified that, when they were in the kitchen, defendant put his "private part in her butt." The victim clearly demonstrated with words, gestures, and on paper that the defendant touched her vagina and her anus with his penis.
Finally, he argues that the doctor who examined the child found no objective evidence to conclude that penetration had occurred either vaginally or anally. Dr. Benton testified that he could not state definitively that D.R. had been sexually abused; however, he also stated that the vast majority of child sexual abuse cases did not have physical findings. He testified that D.R.'s physical exam was abnormal because he found, among other things, a narrowed hymen, which is unusual in four-year-old girls but still not a definitive sign of sexual abuse. Further, the fact that the hymen was still present did not mean that there was no penetration by a penis or some other object. Finally, Dr. Benton testified that although an examination of D.R.'s anus revealed that it was normal, that did not mean that it was not penetrated by a penis or some other object.
Our review of the entire record reveals that the evidence presented at trial was sufficient for the trier of fact to conclude beyond a reasonable doubt that defendant committed the offense of aggravated rape. We are unpersuaded by defendant's arguments and find this assignment without merit.
Next, defendant argues that the trial court abused its discretion in ruling that the child victim, D.R., was competent to testify as a witness at trial. He claims that the child did not understand the difference between truth and falsehood. In support of that contention, he states that, although D.R. admitted to having lied in the past, when asked who she had told the lie to, she said, "Nobody." Defendant also points out that D.R. denied talking to anybody about lying and not lying before appearing in court, but then she admitted that the prosecutor had asked her the same questions (about lying and not lying) before she went to court. Defendant also claims that the trial judge led D.R. into giving the appropriate answers by calling her "Sweetheart."
Our review of the record reveals that defendant did not preserve his right to appeal this issue because he did not lodge a contemporaneous objection after the trial court ruled the child was competent to testify at trial. Failure to make a contemporaneous objection to an error at the guilt phase of a capital trial prevents this Court from reviewing the error.[4] The goal of the contemporaneous objection rule of La.C.Cr.P. art. 841(A) and La. C.E. art. 103 is to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors that he either could have avoided *858 or corrected at the time, or should have put an immediate halt to during the proceedings.[5] Because this issue was not preserved for review, we will not address this assignment of error.
Nevertheless, if we were to reach the merits of defendant's argument, we would again find his argument unpersuasive. In this case, the record as a whole reveals that D.R. understood the difference between the truth and a lie. Although D.R. admitted to having told a lie in the past, she understood that telling a lie in court was a very serious mistake. D.R.'s testimony was coherent, and her answers were responsive to the questions asked. D.R. testified that she understood the difference between telling the truth and telling a lie. The trial court did not abuse its discretion in ruling that D.R. was competent to testify at trial.
Next, defendant claims that the State amended the indictment to change the date of the alleged offense after it was determined that defendant had an alibi for key portions of the alleged criminal activity. He argues that the trial court's exclusion of evidence regarding the State's belated amendment of the indictment robbed him of his ability to present a defense. Defendant contends that the exclusion of testimony concerning the amendment prevented him from being able to impeach the alleged victim regarding her truthfulness. The State responds that defendant was able to argue the date discrepancy and, therefore, he was not prevented in presenting a viable defense. It claims that there has been no showing of an abuse of discretion. The State argues that the error, if any, would be harmless in that the information was cumulative.
A criminal defendant has a constitutional right to present a defense. La. Const. art. I, § 16. As stated in State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, 1037 (citations partially omitted):
To this end, a defendant should be allowed to present evidence on any relevant matter. However, the right to present a defense is not without limits and the state retains a legitimate interest in barring unreliable evidence from criminal trials.
All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402. Louisiana Code of Evidence article 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, risk of misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403; See State v. Mosby, 595 So.2d 1135, 1138 (La. 1992). Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility should not be overturned. State v. Vaughn, 431 So.2d 358, 361 (La.1982).
During trial, defendant argued several times that he should be allowed to introduce evidence showing that the State had amended the dates of occurrence on the indictment. The State responded that the dates on the indictment were amended because their interviews with the police officers and the videotape of D.R. talking to Ms. Gordon showed that the crime could not have been committed on or between July 11 and July 14. The trial judge refused to admit the evidence on several occasions, stating finally:
If you will remember, I read to the jury the first day of the jury selection *859 while we were death penalty qualifying the jury, that an indictment is nothing more than a written, formal accusation against the defendant charging him with a crime.
It is considered only as a vehicle for bringing the defendant into court for you as jurors to determine his guilty [sic] or innocence. You are not to consider the indictment as evidence against the defendant or as an inference of guilt.
I ruled accordingly prior to trial; I've ruled that way doing [sic] the trial. I'm ruling that way again that the indictment is not going to be shown to the jury.... Its [sic] not evidence and its [sic] not going to go to the jury.
Our review of the record reveals, first, that evidence regarding the amendment to the indictment was irrelevant and, therefore, inadmissible, because the original indictment and the subsequent amendment had no relation to the issues that the jury had to resolve to find defendant guilty, i.e., whether defendant committed aggravated rape of a female juvenile under the age of 12 on or between June 2, 1998 and July 21, 1998. Second, defendant fails to show that he was prejudiced by his inability to introduce the amended bill of indictment. Defense counsel was allowed to question the witnesses about the dates and, thus, he did get before the jury the evidence that he now claims was excluded.
Further, the trial judge allowed defendant great latitude in cross-examining the police officers and D.R. who contradicted one another regarding the date the rape occurred. In fact, defendant was free to and did point out to the jury in closing argument that the police report indicated the rape occurred on or between July 11 and July 14, but that defendant could not have committed the crime on those dates because he was working offshore. He also stated during closing argument that the dates of the occurrence of the crime "didn't make sense" and, as such, the jury should find reasonable doubt.
We find that the trial court did not err by refusing to permit the defendant to introduce a copy of the amended indictment. Again, defendant's assignment of error is without merit.
Finally, we have reviewed the record for errors patent pursuant to La. C.Cr.P. art. 920. Defendant was convicted of La. R.S. 14:42, a "sex offense" as defined by La. R.S. 15:542(E). La. R.S. 15:540 et. seq. requires registration of sex offenders. However, the trial judge did not provide written notification of the registration requirements of La. R.S. 15:542 as required by La. R.S. 15:543(A). Therefore, we remand in order for the trial court to inform defendant of the registration requirements of La. R.S. 15:542 by sending appropriate written notice to defendant within ten days of this opinion, and to file written proof in the record that defendant received such notice. State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165.
CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR COMPLIANCE WITH LA. R.S. 15:543(A).
NOTES
[1] In accordance with La. R.S. 46:1844, to protect the identity of the victim, a minor, she and her mother will be referred to by their initials, D.R. and A.R.
[2] The defendant, who D.R. referred to as Paw Paw Danny, is D.R.'s maternal grandfather. Edna, who D.R. referred to as "Grandma Edna" is not her biological grandmother.
[3] At trial, A.R. admitted that she had been convicted of possession of marijuana. She also admitted that her probation was supposed to be revoked because she tested positive after a drug test; however, the assistant district attorney dismissed the charge so she could be in court with D.R. Further, at the time of trial, A.R. had six children ranging in age from nine-months-old to ten-years-old.
[4] State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 375, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
[5] Id. at 368.