973 So.2d 21 (2007)
STATE of Louisiana
v.
Michael K. GADDIS.
No. 07-KA-395.
Court of Appeal of Louisiana, Fifth Circuit.
November 13, 2007.
*22 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Anne Wallis, Shannon Swaim, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Holli A. Herrle-Castillo, Attorney at Law, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Michael K. Gaddis, In Proper Person, Angola, Louisiana.
Panel composed of Judges MARION F. EDWARDS, WALTER J. ROTHSCHILD, and GREG G. GUIDRY.
MARION F. EDWARDS, Judge.
Defendant/appellant appeals his conviction for two counts of aggravated rape. For the reasons that follow, we affirm.
A grand jury in Jefferson Parish returned an indictment against the defendant, Michael K. Gaddis ("Gaddis"), for two counts of aggravated rape between August of 2002 and July of 2003, in violation of LSA-R.S. 14:42. Gaddis pled not guilty at arraignment. After a hearing, the trial judge denied defendant's motion to suppress evidence. Thereafter, the State and Gaddis stipulated to the report of the sanity commission, and the trial judge found Gaddis competent to stand trial.
On October 10, 2006, the defendant proceeded to trial before a twelve-person jury, which found him guilty as charged on both counts the next day. On October 19, 2006, the trial judge sentenced Gaddis to two terms of life imprisonment at hard labor to be served consecutively, without benefit of parole, probation, or suspension of sentence. This timely appeal follows.
Between the summer of 2002 and July of 2003, the female victims, M and K, were under the age of twelve. M and K were first cousins and resided in Kenner with Jeannette, who was M's aunt. Numerous other family members and individuals resided in the household, including Gaddis. At trial, M and K testified that Gaddis had forced them to engage in a variety of sexual acts with him. Gaddis was arrested in July of 2003, after M and K revealed what had happened to them.
At trial, Barbara testified that she was K's mother's friend. Barbara testified that K referred to her as her a grandmother. *23 Barbara testified that she had a "gift" and that the "Lord had been showing [her] that [K] was being tampered with." Barbara said that she had been trying to get K's mother to remove K from Jeannette's household. At a family reunion in 2003, Barbara and K were in Barbara's car seeking shelter from the rain. According to Barbara, she told K that "the Lord showed me that somebody's been fooling with your private parts." K began to cry and responded affirmatively. Barbara located K's mother and K repeated what she had told Barbara. Barbara testified that K mentioned the name "Michael" and that he "fooled with [M] too." Barbara said K did not go into details, but said "it hurt."
K's mother testified that K had moved out of Jeannette's house before the family reunion, which was in July of 2003. According to K's mother, K did not seem herself after returning from Jeannette's. While K's mother did not recall that Barbara mentioned anything regarding any premonitions from God, K's mother corroborated Barbara's testimony in that Barbara sought her out to listen to K at the family reunion. K's mother testified that K was crying when she entered the vehicle. K said that Michael had been feeling on her, lying on top of her, and forcing her to put his "private part" in her mouth. K also disclosed that the same thing had happened with M. When K's mother telephoned M to ask if Michael was "fooling around" with her, M answered affirmatively. K's mother related what she had learned to her father, Alfred (K's grandfather). The next day, K's grandfather and K's mother retrieved M from the house and brought both children to talk to the police.
Detective Jeff Adams ("Detective Adams") testified that he conducted separate interviews with each victim on July 7, 2003. During her interview, K told Detective Adams that her older cousin [the defendant] made her perform oral sex on him. K also said the defendant would make her remove her clothing and "rock back and forth" on him with his clothing off. M told Detective Adams that she was "forced to perform oral sex and that she was digitally penetrated into her vaginal area." The detective then arranged for interviews at the Children's Advocacy Center.[1]
On July 10, 2003, Omalee Gordon ("Ms.Gordon") of the Jefferson Parish Children's Advocacy Center talked to M and K. These interviews were recorded and the tapes were played for the jury at trial. In her interview, K, who was seven years old at the time, told Ms. Gordon that she was six years old the first time Gaddis touched her. K said that the defendant "feels on" her and M on the inside and outside of their clothes. She described that the defendant made her go up and down on the inside and outside of her "butt" on his private part through his open zipper. When he finished, he would have "white stuff" on his private part, and he would make M "lick it off." One time, the defendant touched the inside of K's butt with his private part and he did it to M on one occasion as well. K also said that, four times, he touched the inside of her "private part" with his "private part." K indicated that, more than once, Gaddis made her lick his private part. K described that these events would occur on the couch.
K said that the defendant showed her and M "nasty" movies depicting naked *24 adults of different races. K said she found a gun under the house, which she gave to Jeannette, The defendant located it, and put it under the house. He threatened K with the gun and said he would beat her up.
M was ten years old at the time of her interview. She told Ms. Gordon that she was seven years old the first time that Gaddis touched her. She said Gaddis would make her and K sit on his lap and rock back and forth. He would "hump" M on the outside of her vagina and her butt through her clothes and on her skin.
M detailed a number of specific occasions of abuse. M said the defendant would come into the bathroom while she bathed and rub her breasts. She said that on one occasion, she was lying on the sofa with her baby cousin, Louis, when the defendant put his finger in her vagina. She said that Gaddis got behind her, and that his penis, which she referred to as his "wee-wee," almost went into her behind. The baby fell onto the floor, and Gaddis put the baby in the bed in another room. He put M on her stomach and "humped" the outside of her "butt" and it "touched" the part of her where she went "potty from."
She described that Gaddis would touch her under the kitchen table and would take his penis out of his pants. If anyone came into the room, he would pull his shirt over his lap. He forced her to perform oral sex on him more than once. On one, occasion, she threw up on the defendant because he pushed her head so far down into his lap. She related an occasion in which Gaddis was almost caught by her aunt, Christine.[2] M said that Jeannette had gone out, and Gaddis got into the bed behind M. He pulled her pajamas down and began humping her. Gaddis jumped out of the bed to the floor and attempted to cover his privates with his hand, since he was not wearing a shirt. Christine turned on the lights. She asked M what she was doing, and M said "nothing." Christine left and said "all right then." When Jeannette returned, Christine told her what she had seen. M said that Gaddis had made her, but the defendant told Jeannette that M was lying. Jeannette whipped her. M said Gaddis told her that if she wouldn't do what he wanted, he would force her. She said he held his hand over her mouth.[3] M also said that Gaddis would make K lie on the floor and would get on top of her. K would be "screaming" and her face would be red because the defendant was a "really fat dude" and K couldn't breathe.
Dr. Scott Benton ("Dr.Benton"), an expert in forensic pediatric forensic medicine, pediatric sexual abuse, pediatric emergency medicine, and pediatrics, examined the victims at Children's Hospital. Both victims had normal physical examinations. According to Dr. Benton, there was a study that indicated 80 percent of children who had been penetrated have normal physical exams, which is explained by the body's ability to heal quickly. Dr. Benton testified that "what [K] said was that, Michael Gaddis, an 18, 19 year old boy had touched her in the mouth, her vagina, and her, what she calls, booty or anus with his private part." Dr. Benton testified that he uses a form to aid him in questioning children. Dr. Benton referred to K's form during trial, which indicated that he had circled "yes" regarding oral, *25 vaginal, and anal penetration while questioning K.
Dr. Benton testified that M told him that the defendant made her suck his private part, that he put his "wee-wee" against her behind and "humps" her, and that he had put his finger in her vagina, and that the defendant got on top of her in bed and "rocks up and down." M also said that the defendant's "wee-wee" made hear vagina hurt. The form Dr. Benton used while questioning M reflected "yes" regarding oral, vaginal, and anal penetration.
Because the two girls described to Ms. Gordon that they had been shown pornographic videos, Detective Adams obtained a search warrant. The police seized approximately 15-20 videotapes from Jeannette's residence. These tapes were taken from the storage cabinet next to the television in the front room and from the television stand in the second room, which contained a sofa. Three of the tapes were pornographic. Thereafter, Detective Adams obtained a warrant for the defendant's arrest.
At trial, Gaddis denied that he had ever touched either child inappropriately. He claimed that he never watched any pornographic tape at the house and, further, that he did not even know the pornographic tapes were there.
In his sole assignment of error, Gaddis contends that the evidence is insufficient to support his aggravated rape convictions. Gaddis argues that the testimony of the victims was not credible, that the events could not have occurred as described, and that there was no physical evidence to prove that he had sexual contact with either of the victims.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[4] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[5]
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding.[6] In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.[7]
Between August 2002 and July of 2003, LSA-R.S. 14:41 defined rape as follows:[8]
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, *26 however slight, is sufficient to complete the crime.
C. For purposes of this Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:
(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.
(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.
Between August 2002 and July 2003, LSA-R.S. 14:42 defined aggravated rape in pertinent part:[9]
A. Aggravated rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
. . . .
In State v. Lewis,[10] the court held that evidence of penetration was sufficiently supported by testimony of the victim, despite defendant's claim of fatal inconsistencies between the victim's trial testimony and her statements given shortly after the incident. The physician who examined the victim testified that there was no evidence of penetration or trauma and "gathered" that there was no penetration.[11] At trial, the victim testified that the defendant was unable to achieve an erection, but did make "slight penetration." In affirming the defendant's conviction of aggravated rape, the Second Circuit stated that rape occurs "when there is any penetration, however slight, of the aperture of the female genitalia, even its external features."[12]
Citing Lewis, this Court recently affirmed a defendant's forcible rape conviction in State v. Hawkins,[13] where the victim testified that the defendant "glided his penis" through her vaginal area and answered affirmatively when asked whether the defendant's penis went into or under her vagina in the slightest.
In the instant case, the victims, who were both under the age of twelve at the time of the offenses, consistently saidin their interviews and at trialthat Gaddis forced them to perform oral sex on him. Thus, their testimony established that the defendant committed aggravated rape through oral intercourse under LSA-R.S. 14:42(2) and (4).
While the children were not as explicit in their testimony as to whether or not Gaddis had vaginal or anal intercourse with them, it appears that all of the evidence, including their interviews, their testimony, and Dr. Benton's testimony and notes indicate that Gaddis also *27 committed aggravated rape on both children by anal and/or vaginal sexual intercourse. In particular, although M testified at trial that she was not sure whether the defendant's penis went inside of her "private part," she testified the defendant touched her in her "private part" with his "thing," which would make her stomach hurt. She explained that the defendant made "hard breathing" sounds. In her interview with Ms. Gordon, she explained that the defendant's "wee-wee" touched where she went "potty."
Although K testified she was not certain whether Gaddis' penis went inside her when he made her "rock back and forth' on his exposed "private part" while she was not wearing pants, she answered affirmatively when asked at trial whether it hurt her "butt." K also testified that the defendant made her sit on him from the front and from the back on more than one occasion. She testified she also saw the defendant put M on his lap and rock her back and forth. In fact, during her interview with Ms. Gordon, K detailed a particular occasion in which Gaddis pushed her to the side and told her "let me and [M] get our freak on."
Notwithstanding the detailed accounts of events by these children, Gaddis argues that it was "highly unlikely, if not impossible," that the events could have occurred, as described because there were too, many individuals in the small shotgun house who had nothing better to do than stay home all day. However, according to the victims' testimony, the abuse by Gaddis was not the only odd event transpiring, in that household. K stated in her videotaped interview that her Aunt Jeannette walked around wearing no pants and no underclothes. On more than one occasion, she saw Jeannette masturbating. K testified that Jeannette caught K's uncle (Willie Earl, who was Jeannette's son) in the act of attempting to pull K's pants down. Additionally, when M's Aunt Cristina walked in and witnessed the defendant, she left the room, instead of taking some action against Gaddis. Thus, the defendant's argument that the events described by these children could not have happened is pure speculation.
Gaddis also argues that the jury should not have believed the victims' testimony because of inconsistencies. Gaddis asserts that M testified she did not tell anyone about the abuse, but testified that she had previously told Jeannette. A review of the record reveals that the defendant mischaracterizes M's testimony because the question posed to M was whether she told anyone about the abuse other than Jeannette.
As pointed out by Gaddis, there were some differences in what M. told Ms. Gordon and M's trial testimony. M testified she could not recall when Gaddis first touched her but told Ms. Gordon that the first time was when she was seven years old on the day before summer vacation. M also testified that she did not see the defendant touch K, which contradicted what she told Ms. Gordon.
Additionally, Gaddis points out that K's testimony and that of Ms. Bridges was different in some aspects. For instance, Ms. Bridges testified they sought shelter in her vehicle at the family reunion because of the rain, while K denied that it was raining. Additionally, while Ms. Bridges testified that she asked K if someone was "fooling" with her, K testified that she just went to Ms. Bridges to tell her what had happened.[14]
*28 Moreover, while there may be slight inconsistencies regarding some of the details, both M and K described numerous events that were substantially the same. Both M and K recounted, in separate video interviews in July 2003, the event in which Gaddis put his finger in M's vagina while M was lying on the couch. Both M and K described, in their interviews and at trial, being whipped by Jeannette, which was actually corroborated by Gaddis' trial testimony. Both described, in their interviews, and at trial, being forced to perform oral sex.
Finally, both children testified that they knew they had to tell the truth at trial. M said she knew "bad things" could happen if she lied, and. K said that "you get in more trouble" by telling a lie.
The testimony of the victims and that of Gaddis were in direct conflict. When faced with the conflict, the jury obviously chose to believe to believe the victims. It is the role of the fact-finder to weigh the credibility of witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review.[15] If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the, prosecution must be upheld.[16] A careful review of the record reflects that the jury's decision to believe the victims' accounts of the events over the defendant's testimony was rational. Accordingly, viewed in the light most favorable to the prosecution, we find that the State proved the essential elements of aggravated rape beyond a reasonable doubt.
The defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux,[17] and State v. Weiland[18] regardless of whether a defendant makes such a request. The following matter is noted:
The defendant's convictions are defined as sex offenses by LSA-R.S. 15:541(14.1). LSA-R.S. 15:540, et seq., requires registration of sex offenders and LSA-R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirement of LSA-R.S. 15:542. This Court has held that the trial court's failure to provide this notification constitutes an error patent and warrants a remand for written notification.[19]
Because the record does not reflect that the trial judge provided the defendant with the required written notice, we instruct the trial court to send written notice to the defendant of the sex offender registration requirements within ten days of' this opinion and to file a copy of same in the record.[20]
*29 Accordingly, for the foregoing reasons, defendant's conviction is affirmed.
NOTES
[1] Detective Adams monitored the interview from a separate room in the Children's Advocacy Center.
[2] The defendant testified that Christine was the defendant's grandmother and was the only person in the household who had a job.
[3] It is noted that State's Exhibits 10 and 11 are edited videotapes of the interview with Ms. Gordon, which were played for the jury. The unedited videotapes were introduced for record purposes.
[4] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[5] State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291.
[6] State v. Tapps, 02-547 (La.App. 5 Cir. 10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789.
[7] See State v. Watson, 02-1154 (La.App. 5 Cir. 3/25/03), 844 So.2d 198, 207-208, where this Court held that the victim's testimony alone was sufficient to establish the elements of the offense of aggravated rape.
[8] 2001 La. Acts 2001, No. 301, § 1, in Subsection A, inserted "oral," after "anal"; in Subsection B, inserted a comma after "necessary", inserted "when the rape involves" before "vaginal", and inserted "intercourse" after "anal"; and added Subsection C.
[9] 2001 La. Acts No. 301, § 1, in Subsection A, inserted, "oral," after "anal" in the introductory paragraph.
[10] 577 So.2d 799, 801 (La.App. 2 Cir.1991), writ denied, 582 So.2d 1304.
[11] Id. at 801.
[12] Id.
[13] 06-739 (La.App. 5 Cir. 9/25/07), 968 So.2d 1082.
[14] However, these discrepancies are not necessarily indicative of untruthfulness or incompetence. See State v. Simmons, 03-20 (La. App. 5 Cir. 4/29/03), 845 So.2d 1249, 1258, which recognized that memory lapse and alleged inconsistencies may have resulted from the child-victim's tender age5-years-old on the date of the incident; the traumatic nature of the experience; exposure to unfamiliar surroundings; or the method of interrogation, citing State v. Foy, 439 So.2d 433, 434 (La.1983).
[15] State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.
[16] State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473, 479.
[17] 312 So.2d 337 (La.1975).
[18] 556 So.2d 175 (La.App. 5 Cir.1990).
[19] State v. Morgan, 06-529 (La.App. 5 Cir. 12/12/06), 948 So.2d 199, 213.
[20] State v. Morgan, supra.