SUSAN M. CHEHARDY, Judge.
 

 [ 2Samuel Ross appeals his convictions on two counts of indecent behavior with a juvenile and his sentences of ten years on each count. We affirm the convictions, but vacate the sentences and remand for re-sentencing.
 

 On July 29, 2005, Samuel Ross was charged by bill of information with two counts of violation of La. R.S. 14:81, indecent behavior with a juvenile, occurring on or between March 1 and July 18, 2005. At arraignment Defendant pleaded not guilty. Defendant waived his right to a jury trial and, after a one-day bench trial, he was found guilty as charged.
 

 On April 2, 2009, the trial court sentenced Defendant to ten years at hard labor on each count, without benefit of parole, probation, or suspension of sentence, to be served concurrently. Defendant takes this timely appeal.
 

 FACTS
 

 The gist of the State’s case was that Defendant committed indecent behavior with two female juveniles, K.S. and R.S., who were ages nine and seven at the time of the offense.
 
 [1]
 

 |sD.S., father of the victims, testified that on July 18, 2005 he arranged for his daughters, E.S., K.S. and R.S., to be taken care of by their grandmother, V.F.
 
 [2]
 
 D.S. said he and his wife (the girls’ stepmother) had to go to traffic court. D.S. dropped off the three girls and their grandmother at the Walmart store on Veterans Boule
 
 *477
 
 vard in Metairie, where the grandmother worked. D.S. said the plan was for his daughters to stay at Walmart with their grandmother while she was on the job.
 

 D.S. testified that while he was in court, his daughter E.S. phoned him to tell him the girls were going to the show with “Mr. Sam.” D.S. did not know who Mr. Sam was. E.S. told him Mr. Sam was her grandmother’s neighbor. He told E.S. to put Sam on the phone. When she did so, D.S. asked Sam what he was doing with his children, and told him, “[D]o not move, I’m on my way right now, I’ll be there in ten minutes to get them.”
 

 D.S. went to Rye Street, where V.F. lived, and found the girls waiting for him on the sidewalk with Defendant. The girls got in his truck and he drove away. He did not recall speaking to Defendant. D.S. said he was a little upset, and was very shocked that V.F. would let the girls go with someone he had never met, without his permission. The girls had often visited V.F. prior to that.
 

 D.S. said on the way home he and his wife talked to the girls about the dangers of going with strangers. While driving, he noticed K.S. seemed upset and she was crying. He asked whether there was something she wanted to tell him, and she admitted that Sam had touched her “privates.” She told him she was sitting on Mr. Sam’s lap and he was tickling her. While he was tickling her, he reached down and touched her “flower.” D.S. said “flower” was the word his daughters used for vagina.
 

 |4P.S. said he spoke to R.S., who told him Sam had touched her “ta-ta’s,” which was the word she used for breasts. D.S. also spoke to the oldest daughter, E.S., who told him nothing had happened to her.
 

 Afterward D.S. contacted the police. As a result of his complaint, he later met with Detective Horne. Subsequently he was asked to bring his children to the Children’s Advocacy Center for a forensic interview, where all three girls were interviewed. Later all three underwent medical examinations at the Care Center at Children’s Hospital.
 

 Deputy Kevin Balser of the Jefferson Parish Sheriffs Office testified he responded to the complaint made by D.S. on behalf of his daughter K.S. Deputy Balser testified he spoke to D.S. and K.S. in person and to V.F. by phone. Deputy Balser testified K.S. told him she went to the apartment of a man she called Sam, and while she was there watching movies, “Sam had touched her by her vagina, on the outside of her clothes, and at some point tickled her.”
 

 After speaking with K.S., who was upset and crying, Deputy Balser determined the charge should be investigated. He did not talk to the other children.
 

 Deputy Balser testified he also spoke with the grandmother, V.F., by phone. She told him a gentleman named Sam arrived there and asked to watch the three children, and actually transported the girls to his apartment to watch them. She told him she was a next-door neighbor to Sam.
 

 Pursuant to sheriffs office protocol, Deputy Balser contacted the Detective Bureau’s Personal Violence Section, which investigates sex crimes, and turned the case over to Detective Horne of that section.
 

 Detective Kaye Horne testified she responded to the complaint on July 18, 2005. She said D.S. informed her that during a telephone call with his eldest daughter he learned his daughters were with a Mr. Sam, whom he did not know; 15that he went to pick them up; and that later his middle daughter, K.S., told him Sam had tickled her and “touched her in a bad place.”
 

 
 *478
 
 Detective Horne met privately with K.S., who told the detective “she had been touched inappropriately, and that it started off with tickling, and then Mr. Sam touched her on her vagina over her clothes.” Detective Horne said K.S. referred to her vagina by the word “flower.” According to Detective Horne, K.S. became very upset during questioning, so the detective halted the interview until K.S. could be brought to a more child-friendly atmosphere at the Advocacy Center.
 

 Detective Horne also interviewed the youngest daughter, R.S., who told her that “Mr. Sam had touched her on her bare vagina and tickled her ta-ta’s.” The detective said “ta-ta’s” is the term R.S. used for breasts. Horne said R.S. looked a little upset, but less than K.S., whom Detective Horne described as “very upset, very withdrawn, very nervous.”
 

 Subsequently, all three girls were taken to the Child Advocacy Center in Gretna for an in-depth forensic examination. Detective Horne monitored the interviews of all three girls and she said the stories given by the children were consistent.
 

 As a result of the interviews, Detective Horne testified, she prepared and executed a search warrant for 4020 Rye Street, Apartment 2, Jefferson Parish, which Samuel Ross shared with Henry Owens, whom the children called “Mr. Hank.” The detective said Ross and Owens’ apartment was right next door to the apartment of the children’s grandmother.
 

 Detective Horne found items geared toward juveniles, pictures displaying nudity, and books and magazines of a sexual nature in the apartment. She was able to determine from the children’s descriptions which bedroom belonged to Defendant and which belonged to Owens. The girls told her Defendant’s room had |fia huge DVD collection along the side of the wall. The girls also informed her they had previously gone to the apartment to retrieve juvenile videos from both Defendant and Owens.
 

 Detective Horne testified that in Defendant’s room police found DVDs that included a
 
 Lizzie McGuire
 
 box set, a picture of Hillary Duff, as well as
 
 M
 
 and
 
 Twist
 
 magazines. Horne said all those items are geared to a juvenile audience. There also were a calendar and a signed poster of Hillary Duff in Defendant’s room. E.S. testified she had seen the Hillary Duff and
 
 Lizzie McGuire
 
 items in Defendant’s apartment. Detective Horne testified Defendant had a large collection of juvenile movies rated PG or PG-13,
 
 ie.,
 
 “kidlike in nature” and preteen. In addition, Detective Horne said, the police found two “computer or Xerox cop[ies] of a young female girl with her breasts exposed, kind of sitting in a suggestive manner” and a
 
 Playboy
 
 DVD, as well as a picture and a cartoon displaying nudity.
 

 In the living room, the police found
 
 Playboy, Maxim,
 
 and
 
 X-Site
 
 magazines in the bottom of a magazine rack under the coffee table. Detective Horne said these items were accessible in a common area where the television was located.
 

 Detective Horne acknowledged that some of the items in evidence were recovered from Owens’ room, including the
 
 Playboy
 
 DVD,
 
 Sexual Nude Coeds, Inside Out,
 
 a cartoon of a nude woman and man kissing,
 
 Maximum Sex,
 
 and
 
 50 Favorite Sex Positions.
 
 She said the
 
 Lizzie McGuire, Sleepover
 
 and
 
 Brave New Girl
 
 DVDs and Hilary Duff items were found in Sam’s room.
 

 She was unable to reach Defendant immediately because he was out of town, but after he returned home she contacted him and arranged an interview. Defendant and his counsel came to the Detective Bureau for an interview on August 2, 2005. Defendant was advised of his rights, but
 
 *479
 
 waived them, and gave a recorded audio statement. He admitted he had been alone with the girls, that he |7consumed alcohol while with them, that he sat close to at least one of the girls, and that he hugged them. He also admitted he took photographs of the girls, which he claimed he deleted. Detective Horne said she did not find such photographs. Eventually an arrest warrant for Defendant was issued.
 
 [3]
 

 Omalee Gordon was a forensic interviewer with the Jefferson Parish Children’s Advocacy Center at the time relevant to this case.
 
 [4]
 
 She testified she conducted videotaped interviews of E.S., K.S., and R.S. on July 20, 2005. Those videotapes were entered into evidence.
 

 E.S. testified that at the time of trial she was age 14, her sister R.S. was 11, and her sister K.S. was 12. She recalled that in July 2005, Sam and Hank lived next door to her grandmother’s apartment on Rye Street in Jefferson Parish. She and her sisters would sometimes go inside Sam and Hank’s apartment to watch TV and videos or movies. E.S. remembered one day when her dad had to go to court for something, so her grandmother offered to babysit, but she had to work. E.S. said her father brought her and her sisters to stay with their grandmother at work. They saw “Mr. Sam” there. He told them he was going to take them to the movies, but he had to go home and put clothes in the washer. Her grandmother told them to call their father, and the girls went with Sam.
 

 E.S. testified her grandmother told her to call her father as soon as she arrived. E.S. said tried to call their father using Sam’s phone, but was unable to reach him. When E.S. eventually reached her father, she testified, “I told him we were going to the movies with Sam and that we were going to be okay.” She said her father sounded upset, and he told her to stay outside and wait for him.
 

 IsWhen her father arrive to pick them up, all the girls were crying. E.S. said she was crying because she was scared; she thought she had done something wrong. She acknowledged her father said he was very angry with her grandmother, and they might not be allowed to see their grandmother again. They went to Wendy’s, and that was when her sisters told him what happened. E.S. said she told him nothing had happened to her. She also told him she did not know anything about what happened to her sisters.
 

 E.S. said they then went to her “nanny’s” house, where the police and the detective talked to them. E.S. also recalled meeting with Miss Omalee from the Children’s Advocacy Center, and that she told her nothing happened to her.
 

 E.S. also said she remembered seeing both Sam and Hank tickling her sisters occasionally, and sometimes saw her sisters sitting in Hank’s lap. She could not recall if she had seen them sitting in Sam’s lap. She did not recall seeing any “inappropriate touching” while she was there. E.S. identified Defendant in open court as Mr. Sam.
 

 
 *480
 
 E.S. said her sisters’ behavior changed before coming to court for the trial; they had trouble sleeping, and nightmares. She said K.S. and R.S. had started sleeping in their father’s room. According to E.S., the girls were not allowed to see their grandmother for about a year after this event. E.S. also acknowledged that Sam had a rule about leaving his front door open when the girls were there, and that the door was always open when she was over there.
 

 R.S. testified she was 11 at the time of trial, and that she was seven in 2005. She remembered that before the hurricane her grandmother lived in an apartment in Me-tairie. Her next-door neighbors were Sam and Hank. She and her sisters would visit with Sam and Hank, where they would watch movies. She recalled the day when her father called the police. Earlier that day she was at Walmart with her | ^grandmother while her grandmother was working. She recalled leaving the store with her sisters and Mr. Sam, but she did not remember why she and her sisters went to Defendant’s apartment.
 

 When her sister called their father to tell him they were going to the movies, her father said for them “to wait there and don’t go anywhere.” When her father came to get them he was upset because he said they “should never have went with somebody that wasn’t a family member or anybody we knew close ..., or that he knew.” R.S. said she was a little upset, but not extremely upset, because her father had a look on his face as if she had done something bad. Her father said he was angry at her grandmother and they might not be able to see their grandmother again.
 

 She recalled that when they got home, her father talked to her and she told him that Mr. Sam was touching her in places that she “didn’t feel comfortable with.” Those places were her “boob,” and right by her vagina. She said she used to call her boobs “ta-ta’s” and her vagina “flower.” After that the police came and talked to her. She did not recall being interviewed by other people. She remembered going to the hospital and being examined.
 

 R.S. said they watched TV in the living room where the sofa was. She did not recall seeing anything in there that made her uncomfortable. She remembered that Mr. Hank had naked pictures on the wall in his room. R.S. identified Defendant in open court as Mr. Sam.
 

 R.S. did not recall when the touching happened. When it happened, both her sisters were there, and they were watching a movie. She did not remember whether Sam left the door open when they were at his apartment.
 

 R.S. said her memory of events was better back at the time, when she first talked to Ms. Omalee.
 

 | U)Later, when asked if she remembered on what date or at what time it happened, R.S. replied, “No, sir.” When asked if she remembered that it happened, that her sisters were present, and that it happened at least one time, R.S., replied, ‘Tes, sir.” When asked if it didn’t happen more than one time, R.S. replied, “Not that I remember.”
 

 In her July 20, 2005 recorded session at the Children’s Advocacy Center, R.S. stated she was touched more than once and on different days, but she did not refer to specific dates on which she was touched. However, in a recorded session at Children’s Hospital, R.S. stated she was seven and eight years old when the touching occurred.
 

 In the recorded session at the Children’s Advocacy Center, R.S. also stated that Defendant showed her nasty movies and pictures, and Defendant said nasty things.
 
 *481
 
 R.S. said Defendant would put the nasty magazines in a compartment in the coffee table when other people were around.
 

 K.S. testified she was 12 years old at the time of trial. She was getting ready to go into third grade four years before. She recalled that before the hurricane her grandmother used to live in an apartment. She recalled an incident in 2005 when they had been at Walmart with their grandmother, and their father got very upset. She remembered she and her sisters were ■with her grandmother because her father had to go to court.
 

 K.S. testified when at her grandmother’s apartment they would visit with Mr. Sam and Mr. Hank, who lived next door. She and her sisters would go to their apartment to play darts and watch TV.
 

 On the day her father got mad at them, K.S. testified, her grandmother saw Mr. Sam at Walmart. He asked if they wanted to go to the movies to see the Fantastic Four, so they went with him. She and her sisters went to his house and |nwatched TV, then he said he needed to wash clothes. “Then my sister wanted to call my father, and we’d stand outside.”
 

 K.S. said when her father came he was not happy at all. He said to just get in the car. According to K.S., her father was “just screaming at” Mr. Sam, saying, “[W]hy do you have my kids?” Then they left and went to Wendy’s. In the car she and her sisters were upset. Her father talked to her and she told him, “Mr. Sam drove us, and then that was it.” According to K.S., her father did not ask her anything about Sam.
 

 Later when they were at home, K.S. testified, she told her father that “Mr. Sam touched me in the wrong spot.” K.S. testified she told her father it was on her flower. She explained that at the time she referred her vagina as her flower.
 

 She testified this happened on more than one occasion, and on different days, in the living room of Defendant’s apartment while she and her sisters were there watching television. She did not remember the dates on which it occurred, but said it occurred almost at the end of school, before the summer months.
 

 According to K.S., it would start with her sitting on Mr. Sam’s lap and him tickling her in “okay places,” but then he would move to a bad place. K.S. testified Defendant also would kiss her on her cheek when she was sitting in his lap watching TV. She agreed the door was always open when she was at Sam’s apartment. K.S. identified Defendant in open court as Mr. Sam.
 

 She also said her memory of what happened was better back when she spoke to the police officers. In her recorded session at the Children’s Advocacy Center, when talking about the day Defendant picked up her and her sisters at Walmart, K.S. stated that Defendant tickled her and touched her “flower” while she sat on his lap. She also indicated Defendant touched her breast area. It is unclear, however, whether K.S. was referring specifically to events that took place on July |1218, 2005. Later in her recorded interview, K.S. reported that an incident in which Defendant squeezed her “butt” occurred only once during the school year, although she could not remember the date.
 

 K.S. testified she never told her sisters or anyone else because she was scared. She said she has nightmares about Defendant. According to K.S., she never saw Defendant touch E.S. or R.S. While she was in the car with her sisters, E.S. told her father that nothing happened to her.
 

 The girls’ grandmother, V.F., testified that when her grandchildren, E.S., R.S., and K.S., came to visit her they also would
 
 *482
 
 sometimes visit her neighbors, Sam and Hank. She identified Defendant in open court as Sam. She said on the day the girls were with her at Walmart, she saw Sam there shopping. He offered to take the girls to the movies. V.F. said she told the girls they could go, and told E.S. to call her father. According to V.F., E.S. called her father from the telephone in the store’s Claims Office before they left.
 

 V.F. said she learned of the situation when her daughter, the children’s mother, called her and told her that Sam had abused her grandchildren. She testified the police called her at work later that day, but they never came to see her. They told her she could not see the girls.
 

 Several weeks after Defendant’s statement was taken, the girls were taken to the Audrey Hepburn Care Center at Children's Hospital for medical examinations.
 
 [5]
 
 Dr. Adrienne Atzemis, an expert in the field of pediatric forensic medicine, testified she examined E.S. at Children’s Hospital on August 25, 2005, and that K.S. and R.S. were seen by Dr. Monica Weiner, a senior training fellow at | ^Children’s Hospital on August 19, 2005. Dr. Atzemis testified she supervised Dr. Weiner and she signed off on Dr. Weiner’s findings.
 

 Dr. Atzemis said R.S. was a seven-year-old female at the time of her examination on August 19, 2005. R.S. disclosed “digital vaginal contact over her clothes by Mr. Sam,” that “Mr. Sam and Mr. Hank had touched her ta-ta’s over her clothes,” and stated “she was exposed to pornography by Mr. Hank at Mr. Sam’s house.” According to Dr. Atzemis, she would have expected to find and did find “an essentially normal examination,” given the history of touching over R.S.’s clothing.
 

 The doctor stated K.S. was a nine-year-old female at the time of her examination on August 19, 2005. She disclosed there was “digital vaginal contact by Mr. Sam, possibly over clothes”, and “that she was exposed to pornography at Mr. Hank and Mr. Sam’s house.” According to Dr. At-zemis, based upon K.S.’s disclosure she would have expected to find a normal examination and, in fact, there where no positive findings indicating any sexual trauma or physical abnormality. However, it was reported that K.S. had daytime urinary control accidents and nocturnal incontinence, which Dr. Atzemis opined could be a stress-induced behavior.
 

 Dr. Atzemis stated E.S. was an eleven-year-old female at the time of her examination on August 25, 2005. The doctor testified E.S. disclosed that “something had happened” and said she had seen pictures of naked women, of “ta-ta’s” of women, at Mr. Sam and Mr. Henry’s house. E.S. said she had been at Walmart with her grandmother, that she and her sisters went to Mr. Sam’s place to watch a movie, she called her father and he came, and they were waiting outside. The father was upset and was yelling.
 

 | HPr. Atzemis said E.S. told her she was wondering what was happening when she was not there, since she had never seen her sisters get touched. According to Dr. Atzemis, based upon E.S.’s disclosure she would have expected to find a normal examination, and in fact she did.
 

 The recordings of the Care Center interviews of all three girls were entered into evidence.
 

 At trial Defendant, a 47-year-old man, testified that in 2005 he lived at 4020 Rye Street, Apartment 2. Defendant testified
 
 *483
 
 that when he came home on one occasion, he found Owens in the apartment with six girls, including E.S, K.S., and R.S. Defendant said he told both Owens and the girls’ grandmother he thought it was inappropriate.
 

 Defendant asserted he told the girls’ grandmother several times that he did not want the girls to come over because it was inappropriate. He said he told her, “[I]t only takes an allegation to ruin someone’s life, and I do not want to be there.” He claimed he was overruled by Hank and the grandmother, however, who allowed the girls to continue visiting, until after a while he “just kind of got used to them being there all the time.”
 

 Defendant testified that at first he just loaned the girls his DVDs. He said that 10 to 20 percent of his movies were children’s movies,
 
 ie.,
 
 Disney movies, including Hillary Duff movies. Defendant claimed he was “trying to watch more wholesome stuff,” which he was advised to do when he was baptized. He said he liked Hilary Duff for her singing voice.
 

 According to Defendant, he asked the girls’ grandmother if she wanted to censor the movies, but she replied that the girls could censor the movies themselves. She told him the girls knew what was appropriate for them to watch and the girls could get up and leave the room.
 

 115 Accor ding to Defendant, he told the girls that if they came over to his apartment, they had to be sure their grandmother knew exactly where they were. He testified he gave the girls three rules after he discussed it with their grandmother. The rules were that the front door had to stay open so anyone could check on them; they had to stay in the living room; and if anyone touched them in a way that made them feel inappropriate, they had to leave immediately and tell their parents. According to Defendant, the girls always came over together and never stayed alone.
 

 Defendant testified that on July 18, 2005 he went to shop at Walmart and stopped to say hello to the girls’ grandmother. On that day, he said, the girls’ grandmother was upset because she had to watch the girls while at work. Defendant testified he offered to take the girls to a movie to get them “out of her hair.” He told the grandmother he would come back to pick her up when she got off work and take them all home.
 

 According to Defendant, the grandmother did not seem to have a problem with him taking the girls to the movie, but she did instruct the girls to call their father before they left with him. Defendant testified he told the grandmother he would have to stop home to get his cell phone in order for the girls to use it.
 

 Defendant said that when they arrived at his apartment, he gave E.S. the phone, then went upstairs to get his clothes out of the laundry room. When he returned, E.S. told him she was having trouble reaching her father. Defendant told her to keep trying because they could not go to the movie until she called her father. When E.S. reached her father by phone, he started yelling at her and she started crying.
 

 Defendant testified E.S. handed him the phone and he spoke to the father, who told him to keep the girls there and that he would be there in 10 minutes. |! (According to Defendant, when the father arrived he shook Defendant’s hand and told him he was really disappointed in the girls’ grandmother. Defendant said he told the father, “I didn’t mean to do anything wrong. I didn’t mean to upset you.”
 

 Defendant said he never touched the children inappropriately. He testified he never let the girls sit on his lap, and he
 
 *484
 
 never kissed any of them on the cheek. In addition, he testified he did not show them sexually explicit photographs or inappropriate programs.
 

 According to Defendant, Hank Owens made the computer-generated photographs found by the police. Defendant testified the photographs had Owens’ handwriting on them. Defendant claimed Owens owned the furniture and everything else in the living room. Defendant said he was unaware of the magazines that were in the coffee table.
 
 [6]
 

 In rendering a verdict against Defendant, the trial judge stated he found the testimony of the three children “detailed and rich in fact.” The judge pointed out, “They testified in great detail about the apartment, the apartment’s setup, items that were in the apartment, things that were shown to them,” items that in fact were recovered by police on executing the search warrant. The judge also found the girls’ testimony “in sync with the dates as specified in the Bill of Information, March 1st through July 18th.” The judge acknowledged there was some inconsistency in the children’s testimony, but stated he found it was
 
 de minimis.
 

 The judge concluded,
 

 If there was any inconsistency in the testimony, it was yours.
 

 You sit before me and proclaim with great conviction that you were aware that this was a bad set of 117circumstances; you, quote unquote, knew this was coming.... I think, to sum up your testimony from start to finish, it was the blame game, and it was everybody else’s fault but your own.
 

 [[Image here]]
 

 [Wjhile you tell the Court that you felt uncomfortable, that it was a bad situation, that you had strict rules, after coming off an extended work schedule, being home for three scant days before going back out, a man of your age takes one out of those three available vacation days and picks up children that you are uncomfortable with, that you know is a bad scene, that you shouldn’t have alone in your apartment. That’s under the pretext of taking those children to the movies. And you didn’t take them to the movies; you took them back to your apartment, the very thing you sit in this witness stand and tell me is inappropriate.
 

 I did make note of the girls and their testimony. The record, when it’s reviewed in typewritten form, will never indicate the emotion that those girls had while testifying. I did make note that they had difficulty making eye contact with you. There were times we had to take breaks because their emotions were getting the best of them. Yet, when you testified, sir, it was in a very rapid, almost well-rehearsed manner, void of any emotion.
 

 The judge stated he believed the testimony of the girls and believed the State had proven its case.
 

 The trial court found Defendant guilty as charged on both counts.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 In his first assignment, Defendant claims there was insufficient evidence to sustain his conviction.
 

 
 *485
 
 Between March 1 and July 18 of 2005, when Defendant was alleged to have committed the offenses, La. R.S. 14:81(A) stated in pertinent part:
 

 Indecent behavior with juveniles is the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing |1sor gratifying the sexual desires of either person. Lack of knowledge of the child’s age shall not be a defense.
 
 [7]
 

 Defendant does not dispute the age difference between himself and the two victims. However, he claims “any touching that occurred was unintentional, and not with the intent to arouse or gratify the sexual desire of either the victims or [himself].” Defendant contends the girls were accidentally touched during the course of an innocent act, ie., one not sexual in nature, when he was tickling them in a normal manner. Defendant claims he did not touch the girls’ buttocks. He also notes that none of the girls saw him touch either R.S. or K.S., and that it is undisputed the door was always left open when any children were inside the apartment.
 

 Defendant points out that R.S. told several versions of how he allegedly touched her breasts and vagina. In addition, he argues, there was no evidence that he made sexual comments to R.S. Defendant suggests the alleged kiss on the cheek was harmless, not a lewd and lascivious act. Defendant claims that none of the pornographic material had a connection to him. Rather, the pornographic material belonged to Owens, and it was kept either in Owens’ bedroom or in the magazine rack. He contends that neither R.S. nor K.S. testified he exposed them to the pornographic material. In addition, Defendant claims none of the alleged incidents occurred on the day he picked up the girls from Walmart, ie., July 18, |192005, and none of the girls could state specifically when the alleged incidents occurred.
 

 The State claims it presented sufficient evidence to support Defendant’s conviction. The State notes that E.S. testified she saw Defendant tickle both her sisters. In addition, the girls’ father testified K.S. told him that Defendant touched her vagina while tickling her as she sat on his lap, and R.S. told him that Defendant touched her breasts. Deputy Balser and Detective Horne both testified that K.S. told them Defendant touched her vagina on the outside of her clothes. Detective Horne testified R.S. told her Defendant touched her bare vagina and her breasts.
 

 The State claims the girls’ subsequent interviews at the Children’s Advocacy Cen
 
 *486
 
 ter were consistent, and that any inconsistencies in the girls’ testimonies do not undermine the verdict. The State points out that, although the trial judge recognized there were inconsistencies in the girls’ testimonies, the trial judge found the girls’ testimonies were more credible.
 

 “The standard for appellate review of the sufficiency of evidence is ‘whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ”
 
 State v. Battaglia,
 
 03-692, p. 5 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 708,
 
 writ denied,
 
 04-1701 (La.4/29/05), 901 So.2d 1058, quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).
 

 The weight of evidence is a question of fact solely determined by the trier of fact, who may accept or reject, in whole or in part, the testimony of any witnesses.
 
 State v. Lyles,
 
 03-141, p. 18 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 50. In sexual offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, 12l)scientific or physical evidence to prove the commission of the offense.
 
 State v. Gaddis,
 
 07-395, pp. 7-8 (La.App. 5 Cir. 11/13/07), 973 So.2d 21, 25,
 
 writ denied,
 
 08-0156 (La.10/10/08), 993 So.2d 1277.
 

 Appellate review for minimal constitutional sufficiency of evidence is limited and restricted by the standard developed in
 
 Jackson v. Virginia. Lyles,
 
 03-141 at 18, 858 So.2d at 50. Under the
 
 Jackson v. Virginia
 
 standard, a review of a criminal conviction record for sufficiency of evidence does not require the appellate court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.
 
 Battaglia,
 
 03-692 at 5, 861 So.2d at 708. Rather, the appellate court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt.
 
 Id.
 

 In order to convict a defendant of indecent behavior with juveniles, the State must prove that (1) there was an age difference of greater than two years between the defendant and the victim, who was not yet seventeen, (2) the defendant committed a lewd or lascivious act upon the person or in the presence of a child, and (3) the defendant intended to arouse or gratify either his own or the victim’s sexual desires.
 
 Lyles,
 
 03-141 at 18-19, 858 So.2d at 50.
 

 Specific intent is a state of mind and, therefore, need not be proven as a fact. Rather, it may be inferred from the circumstances and actions of the defendant.
 
 Lyles,
 
 03-141 at 19, 858 So.2d at 50. The victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the crime.
 
 Lyles,
 
 03-141 at 19, 858 So.2d at 50-51. One witness’s testimony, if believed by the trial court, is sufficient to support a conviction in the absence of internal contradiction or irreconcilable conflicts with physical evidence.
 
 Battaglia,
 
 03-692 at 7, 861 So.2d at 709.
 

 laiIn
 
 Lyles,
 
 the evidence established that the two victims were under the age of seventeen and that there was an age difference of greater than two years between the victims and the defendant. One of the victims testified that, when she was eight or nine years old, the defendant took her hand, placed it on his private, and moved her hand on top of his private. Then, the defendant kissed her and put his tongue in her mouth. The other victim testified that on one occasion, when she was in fifth
 
 *487
 
 grade, the defendant touched her privacy part, i.e., in the front between her legs, and moved his hand up and down. That victim also testified that, on a separate occasion, when she was playing with her cousins, the defendant kissed her, putting his tongue in her mouth.
 
 Lyles,
 
 03-141 at 19, 858 So.2d at 51.
 

 In
 
 Lyles
 
 this Court found that viewing the evidence in the light most favorable to the State, a rational trier of fact could have found, beyond a reasonable doubt, that the defendant committed two counts of indecent behavior with a juvenile.
 
 Id.
 

 In
 
 Battaglia, supra,
 
 the evidence established that at the time of the offense the victim was 16 years old and the defendant was a great deal more than two years older. The victim testified the defendant was the man who pulled her into his apartment, locked the door, grabbed her breasts, buttocks, and between her legs on her private. She also testified the defendant offered her $400 to have sex with him and $40 to pose for a photograph. Two police officers testified that the victim relayed these events to them. 03-692 at 6, 861 So.2d at 708. The same officers recovered photographs of nude individuals and a camera from the defendant’s apartment. 03-692 at 6, 861 So.2d at 708-09.
 

 In
 
 Battaglia
 
 this Court noted the jury apparently found the State’s witnesses more credible than the defendant’s testimony, because the jury returned a guilty verdict. 03-692 at 6, 861 So.2d at 709. We found that the victim’s testimony and | ¡.¡>the officer’s corroboration of certain details of her testimony provided the necessary proof of the three elements of the offense. 03-692 at 6, 861 So.2d at 709. In addition, we found there were no internal contradictions or irreconcilable conflicts with the physical evidence. Rather, the physical evidence supported the victim’s testimony. After viewing the evidence in the light most favorable to the State, we concluded that any rational trier of fact could have found the essential elements of the crime of indecent behavior with a juvenile beyond a reasonable doubt and, thus, there was sufficient evidence to convict the defendant. 03-692 at 7, 861 So.2d at 709.
 

 In the present case, E.S. testified she had seen Defendant tickling her sisters on more than one occasion previously. At trial, R.S. testified Defendant touched her breast and “right by [her] vagina.” Detective Horne testified R.S. told her that Defendant touched her on her bare vagina and tickled her breasts. In her recorded session at the Children’s Advocacy Center, R.S. stated that Defendant showed her nasty movies and pictures, and said nasty things. Deputy Balser testified K.S. told him, “[Defendant] had touched her by her vagina, on the outside of her clothes, and at some point tickled her.”
 

 K.S. testified she told her father [Defendant] touched [her] in the wrong spot. K.S. testified that at the time she referred to her vagina as her flower. According to K.S., this happened on more than one occasion in Defendant’s apartment, and it would start with her sitting on Defendant’s lap and him tickling her in appropriate places. K.S. testified Defendant would also kiss her cheek when she was sitting in his lap. K.S. said she has nightmares about Defendant. In addition, in her recorded interview at the Children’s Advocacy Center, K.S. reported that Defendant squeezed her “butt” once during the school year.
 

 [g-jD.S. testified K.S. told him that while she was sitting on Defendant’s lap and he was tickling her, Defendant reached down and touched her vagina. Deputy Balser testified K.S. told him that Defendant initially tickled her, then touched her on her vagina over her clothes. Detective Horne
 
 *488
 
 testified K.S. told her that she had been touched inappropriately.
 

 The trial judge noted that the inconsistencies in the girls’ testimonies were minimal, and that the girls’ testimonies were “in sync” with the dates specified in the bill of information. The judge indicated he found the accounts of the victims, who were all minors, were more credible than the 47-year-old defendant’s account that he did not touch the victims inappropriately-
 

 “The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.”
 
 State v. Simmons,
 
 03-20, p. 14 (La.App. 5 Cir. 4/29/03), 845 So.2d 1249, 1258. “It is not the function of the appellate court to second-guess the credibility determinations of the trier of fact or to reweigh the evidence.”
 
 State v. McClain,
 
 04-98, p. 6 (La.App. 5 Cir. 6/29/04), 877 So.2d 1135, 1140,
 
 writ denied,
 
 04-1929 (La.12/10/04), 888 So.2d 835.
 

 An appellate court may impinge on the fact-finding function of the trier of fact only to the extent necessary to assure the
 
 Jackson v. Virginia
 
 standard of review.
 
 Lyles,
 
 03-141 at 18, 858 So.2d at 50. Therefore, an appellate court accords great deference to the finder of fact’s decision to accept or reject the testimony of a witness in whole or in part.
 
 McClain,
 
 04-98 at 6-7, 877 So.2d at 1140. “The credibility of witnesses will not be reweighed on appeal.”
 
 State v. Dickerson,
 
 01-1287, p. 11 (La.App. 5 Cir. 6/26/02), 822 So.2d 849, 856,
 
 writ denied,
 
 02-2108 (La.2/21/03), 837 So.2d 627.
 

 | i>Jn
 
 Gaddis,
 
 this Court found that while there may have been slight inconsistencies regarding some of the details in the minor victims’ accounts, they were substantially the same. 07-395 at 11, 973 So.2d at 28. We noted that when faced with a conflict between the victims’ testimony and the defendant’s testimony, the jury obviously chose to believe the victims. 07-395 at 12, 973 So.2d at 28. We stated that it was the role of the fact-finder to weigh the credibility of witnesses, and that a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the
 
 Jackson
 
 standard of review.
 
 Id.
 
 We noted that if rational triers of fact could disagree as to the interpretation of the evidence, then the rational trier’s view of all the evidence most favorable to the prosecution must be upheld.
 
 Id.
 

 In
 
 Gaddis
 
 we found a careful review of the record reflected that the trier-of-fact’s decision to believe the victims’ accounts of the events over the defendant’s testimony was rational and, therefore, viewed in the light most favorable to the prosecution, the State had proven its case.
 
 Id.
 

 Here, based on the evidence provided by the State, including the testimony of the victims, the trial judge properly found that the State proved the essential elements of the offense of indecent behavior with juveniles beyond a reasonable doubt and, therefore, Defendant was guilty as charged. Accordingly, we find no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 In his second assignment Defendant claims his sentence of 10 years on each count is illegal because at the time the offense was committed, the maximum sentence under La. R.S. 14:81 was seven years.
 

 Prior to trial, the court erroneously informed Defendant that the sentencing range for indecent behavior with a juvenile was two years to 25 years without | ^benefit of parole, probation, or suspen
 
 *489
 
 sion of sentence. At sentencing, the court imposed sentences of ten years at hard labor on each count without benefit of parole, probation, or suspension of sentence, to be served concurrently.
 

 At the time Defendant committed the offenses, however, the two-to-twenty-five-year sentencing range was not the penalty provision of La. R.S. 14:81. La. R.S 14:81 was amended by Louisiana Acts 2006, No. 103, § 1, and No. 224, § 1, to add a provision allowing a greater penalty where the indecent behavior is on a victim under age 13.
 
 [8]
 

 At the time that Defendant committed the offenses, the penalty provision of La. R.S. 14:81 stated:
 

 C. Whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.
 

 Although the new penalty provision of La. R.S. 14:81, as amended, was in effect when Defendant was sentenced, Defendant must be sentenced under the penalty provision of La. R.S. 14:81 in effect at the time he committed the offense. The State admits that the penalty provision of La. R.S. 14:81 in effect at the time Defendant committed the offenses provided for a maximum term of seven years imprisonment, and the State admits that Defendant must be sentenced according to the version in effect at that time.
 

 | gfjUnder La. C. Cr. P. art. 882, an illegal sentence may be corrected at any time on review by an appellate court; in an appeal-able case, legality of a sentence may be reviewed on the application either of the defendant or of the state.
 

 The defendant’s imposed sentence of ten years on each count is illegal because at the time of commission of the offenses, the maximum term of imprisonment under La. R.S 14:81 was seven years.
 

 In addition, we note there is a patent error, in that the court ordered that the terms of imprisonment be served without benefit of parole, probation, or suspension of sentence.
 
 [9]
 
 At the time of commission of the offense, the penalty provision of La. R.S 14:81 did not require that the term of imprisonment be served without benefit of parole, probation, or suspension of sentence.
 

 
 *490
 
 Accordingly, the sentences will be vacated and the matter remanded for the district court to re-sentence Defendant pursuant to the penalty provision of La. R.S. 14:81 in effect at the time he committed the offenses.
 

 DECREE
 

 For the foregoing reasons, the convictions are affirmed. The sentences are vacated and the case is remanded for resen-tencing according to the views expressed in this opinion.
 

 CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING
 

 [1]
 

 . Pursuant to La. R.S. 46:1844(W)(3), we refer to the victims of these sex offenses and their relatives by their initials to protect the victims' identities.
 
 State v. Berniard,
 
 03-484, p. 2 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 69 n. 1,
 
 writ denied,
 
 03-3210 (La.3/26/0), 871 So.2d 345.
 

 [2]
 

 . During audio-taped sessions at the Children's Advocacy Center on July 20, 2005, E.S. reported she was eleven years old, K.S. reported she was nine, and R.S. reported she was seven. On the date of trial, E.S. was fourteen, K.S. was twelve, and R.S. was eleven.
 

 [3]
 

 . Detective Horne testified the investigation was interrupted due to Hurricane Katrina in August 2005. In the aftermath the sheriff's office lost patrol officers, so officers from the detective bureau — including Home — were assigned to patrol duty. Detective Horne said she was unable to follow up on this investigation for months due to post-Katrina circumstances.
 

 [4]
 

 . Gordon described the Children’s Advocacy Center, or CAC, as "a neutral facility where children are brought when they've made allegations of having crimes committed against them, or when children have witnessed crimes.”
 

 [5]
 

 . The Audrey Hepburn Care Center is devoted to the care and treatment of children who are suspected of having undergone maltreatment of some kind, including physical abuse, sexual abuse, or maltreatment such as neglect.
 

 [6]
 

 . Detective Horne testified E.S., K.S., and R.S. all indicated that Owens touched them inappropriately. She said she interviewed Hank Owens and took three statements from him because his story was not consistent. She did not arrest him, however, but forwarded information about him to the district attorney's office. According to Horne, the district attorney did not accept charges against Owen.
 

 [7]
 

 . Louisiana Acts 2006, No. 103, § 1 rewrote subsection A to add a provision define transmission to juveniles of electronic communications or images depicting lewd or lascivious conduct, text, or images part of the definition of indecent behavior with juveniles. La. R.S. 14:81(A)(2). The current version of La. R.S. 14:81(A) states:
 

 (A) Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
 

 (1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child’s age shall not be a defense; or
 

 (2) The transmission of an electronic textual communication or an electronic visual communication depicting lewd or lascivious conduct, text, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. It shall not be a defense that the person who actually receives the transmission is not under the age of seventeen.
 

 [8]
 

 . In the amended version of La. R.S. 14:81, the statute's old penalty provision — formerly paragraph C — is now subparagraph (H)(1), and the newly-added penalty provision is sub-paragraph (H)(2), as follows:
 

 H. (1) Whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.
 

 (2) Whoever commits the crime of indecent behavior with juveniles on a victim under the age of thirteen when the offender is seventeen years of age or older, shall be punished by imprisonment at hard labor for not less than two nor more than twenty-five years. At least two years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.
 

 [9]
 

 . Although Defendant requested an error patent review, this Court routinely reviews the record for patent errors, regardless whether the defendant makes such a request.
 
 See
 
 La. C. Cr. P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).